UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

In the Matter of the Application of

United Company Rusal, PLC, and United
Company Rusal Investment Management, LLC
for an Order Pursuant to 28 U.S.C. § 1782, to
obtain discovery from Trafigura AG for Use in
Foreign Proceedings.

---

## DECLARATION OF MAXIM SOKOV

I, MAXIM SOKOV, declare as follows:

1.  I am the Director for Corporate Strategy of Rusal Global Management BV., the
    management company of United Company Rusal plc. ("UC Rusal plc") group. I am
    also the General Director of United Company RUSAL Investment Management LLC
    ("UC RUSAL LLC") (UC Rusal plc and UC RUSAL LLC are referred together as
    the "Applicants" or "Rusal").

2.  UC RUSAL LLC is a wholly owned (indirect) subsidiary of UC Rusal plc, and is the
    entity through which the Applicants hold an interest in Open Joint Stock Company
    Mining and Metallurgical Company Norilsk Nickel a.k.a. OJSC MMC Norilsk
    Nickel ("Norilsk"). Since 2008, I have been a non-executive member of the board of
    directors of Norilsk.

3.  I graduated from the Russian State Tax Academy and then from New York
    University School of Law with a Masters of Law degree. I then worked as a lawyer
    for the Moscow Representative Office of Herbert Smith OS Legal Services. I am
    dual qualified in New York and Russian law.

4.  I have worked for Rusal since 2004. I was initially Head of M&A in Rusal's Legal
    Department. I then headed the Department for Strategic Projects and later was
    appointed as Director for Investment Management with a major responsibility to
    manage Rusal's investment in Norilsk.

5.  I am familiar with the business of Rusal and I am duly authorized to submit this
    Declaration in support of the relief claimed.

6.  The facts and the matters testified to herein are from my own knowledge, save where
    I indicate otherwise. Insofar as they are within my own knowledge, the facts and
    matters testified to are true to the best of my own knowledge and belief. Where I

rely on matters not within my knowledge the sources I rely on for my information and on which my belief is based are the persons or documents I refer to or both.

A.  PURPOSE OF THIS APPLICATION

7.  The purpose of this application is to obtain discovery pursuant to 28 U.S.C. § 1782 in support of actions pending in foreign courts or arbitral tribunals.

8.  Rusal, a substantial shareholder in Norilsk, has been the victim of an unlawful scheme perpetrated by another large Norilsk shareholder, Interros International Investments Limited ("Interros"), and complicit Norilsk management to wrest control of Norilsk for themselves to the detriment of Rusal.  At the heart of the current scheme are two corporate transactions by offshore Norilsk subsidiaries which were announced on 20 and 29 December 2010.  One, the "Trafigura Deal," involved the *sale* of approximately 8% of outstanding Norilsk stock to Trafigura Beheer BV ("Trafigura BV"),[1] a Dutch affiliate of the Trafigura Group, for a price which was claimed by Norilsk to be the market price[2] (on the date of the announcement of the Trafigura deal such price was approximately *$217* per share[3]), while the other, the "Buyback Deal," involved the *purchase* of approximately 7.2% of outstanding Norilsk stock for *$252* per share.[4]  On their face, these contemporaneous transactions make no economic sense.  The only possible conclusion in my view is that they were done for improper purposes, namely: (1) to evade provisions of Russian law and (2) to circumvent a Cooperation Agreement between Interros and Rusal that governs the voting of Norilsk shares and was designed to ensure parity between the two large shareholders.

9.  Matters are moving at a great pace in the wake of these two highly questionable transactions.  To protect its rights, Rusal has commenced several legal proceedings seeking urgent relief, including an arbitration before the LCIA, a court action in Russia and a court action in St. Christopher and Nevis.  The relevant facts, the parties involved, and the nature of the foreign proceedings, are set forth in greater detail in my affidavit filed in support of the action filed on 2 February 2011 in the Nevis court ("Nevis Affidavit"), which is attached hereto as Exhibit 1 and incorporated by reference.

10.  To prosecute its claims effectively before these foreign tribunals, Rusal requires the aid of this Court to issue discovery on an expedited basis that will uncover evidence directly relevant to those actions that would not otherwise be obtainable.  By this

---

[1] *See* Exhibit C to the Declaration of Christopher D. Kercher (Norilsk Press Release dated December 20, 2010), dated February 9, 2011.  Hereinafter, all references to lettered exhibits will be to the exhibits to the Kercher Declaration.

[2] Ex. S (Norilsk Press Release dated December 23, 2010).

[3] Ex. Z (stock price and exchange rate for December 20, 2010).

[4] Ex. J (Corbiere Holdings Offering Memorandum).

application, Rusal seeks relatively straightforward and narrow disclosure orders against Trafigura AG.

11.  The application is for disclosure of documents evidencing the contractual and other arrangements between the counterparties in the transactions (or their nominees) and the identities of human actors behind the contractual arrangements which I believe form part of a more elaborate unlawful scheme to damage Rusal's interests.  Rusal knows that contractual arrangements exist and it knows the identities of some of the parties on the basis of public disclosures.  However, Rusal does not know the terms of the contract(s) and any underlying side deal between the counterparties (or their nominees).  Rusal needs certain information and documents to establish these facts.  Both of these facts (i.e. the terms of the contractual arrangements to understand the true nature of the scheme being operated and who is behind the plan) are crucial to establishing Rusal's claims against the substantive defendants and ensuring that all the proper defendants are identified and pursued.  So, while the disclosure orders that are needed will establish some fairly simple facts, the background to this application is complex and spans a number of jurisdictions.

12.  I believe also that matters have been made deliberately complicated by the substantive defendants who have spread their activities globally, putting offshore corporate vehicles operated via nominees in the way to conceal wrongdoing and to protect themselves from litigation. Rusal has been unable to obtain the information and disclosure by other means.

B.  THE BACKGROUND FACTS AND RELEVANT PARTIES

13.  Rusal's action has been triggered by two consecutive corporate transactions that were announced just over a week apart from each other on 20 and 29 December 2010. These transactions have been designed to damage Rusal's interest in Norilsk. By way of broad overview, the first transaction involves the sale of shares by Corbiere and other indirect subsidiaries of Norilsk (probably Raleigh) to Trafigura. The second transaction involves a series of share purchases by Corbiere.

14.  I have set out the details of the unlawful transactions, how they inter-connect, how they threaten to cause substantial and imminent harm to Rusal's interests in my Nevis Affidavit from paragraph 30 onwards.  Importantly for present purposes, I do not know the precise terms of the Trafigura Deal, what other arrangements are in place between Norilsk/Interros, their associates and Trafigura, or who made them, although I have a better understanding of the Buyback Deal since much of the relevant material is contained in publicly available documents.

15.  As I will explain in the following section, the Trafigura Deal and the Buyback Deal fall foul of various laws including those in Russia and in Nevis.

C.  THE LCIA, RUSSIAN AND NEVIS CLAIMS

16.  UC Rusal plc initiated and is prosecuting the LCIA claim against Interros for breach of the Cooperation Agreement (see paragraph 25 – 29 of my Nevis Affidavit). I have

not exhibited the statements of case filed in the LCIA claim since they are confidential.[5]

17.   UC Rusal Investment Management LLC has initiated proceedings against Corbiere, Raleigh, Trafigura and others in Russia to challenge the Trafigura Deal and against Corbiere and Norilsk to challenge the Buyback Deal (see paragraphs 86 – 96 of my Nevis Affidavit).[6] The primary basis for these claims under Russian law is set out at paragraph 90 and 91 of my Nevis Affidavit. Importantly, for the purposes of this application, I wish to highlight the preliminary ruling made by the Russian court which is that they have ordered a stay of the Russian claims pending provision of further information and documentation by Rusal (see paragraphs 92 and 96 of my Nevis Affidavit).[7]

18.   In the substantive claim in Nevis, Rusal seeks (amongst other matters) a declaration from the Nevis court that any shares held by Corbiere and Raleigh in Norilsk as a result of the Buyback Deal are not shares entitled to vote in accordance with Section 70(3) of the Nevis Business Corporation Ordinance, 1984 as amended. Claims are also made for conspiracy and for wrongful interference with contractual rights under the Cooperation Agreement.[8] On 2 February 2011, Rusal made a successful ex-parte application for injunctive relief and issued proceedings against Corbiere and Raleigh in the Nevis court.[9] Rusal sought orders restraining Corbiere and Raleigh from voting their shares or from disposing of them without Rusal's consent. The return date is fixed to take place on 2 March 2011.

D.   **THE RESPONDENTS ARE LIKELY TO HOLD RELEVANT DOCUMENTS**

19.   I will now explain in more detail why the Respondent is likely to be able to provide the information necessary to enable the ultimate wrongdoer to be sued.

20.   Trafigura AG resides in Connecticut through its Stamford office and, I believe, holds information and documents which are needed to enable action to be brought against the ultimate wrongdoers in the foreign jurisdictions.

21.   Trafigura AG (with its affiliates "Trafigura") is one of the world's leading commodities dealers, headquartered in Switzerland.  Through a Dutch affiliate, Trafigura Beheer BV ("Trafigura BV"), it has agreed to purchase the ADR shares from Norilsk in the Trafigura Deal.[10]

---

[5]   *See also* Exs. N, O.

[6]   *See also* Exs. P, R.

[7]   *See also* Exs. T, U.

[8]   *See* Ex. V.

[9]   *See* Ex. X.

[10]   *See* Ex. C.

22.  Trafigura was originally founded by colleagues of the fugitive commodities trader Marc Rich. It now operates through a byzantine network of international affiliates presumably designed, at least in part, to obscure the activities of any one affiliate. According to Trafigura BV's 2010 Annual Report, it has over 100 "principal operating subsidiaries" domiciled under the laws of countries including Estonia, Norway, Angola, Bahamas, Peru, Zambia, Isle of Man, Mongolia, the Cayman Islands, Singapore, Mexico, Switzerland, Cyprus, the Marshall Islands, Malta and dozens of others.[11]

23.  I have reason to believe that Trafigura AG would have evidence of the Trafigura Deal, although it has been reported that the transaction was nominally entered into by its affiliate Trafigura BV. Among other reasons, I understand from the Trafigura group's website that that Trafigura BV shares physical office space at the Trafigura AG headquarters in Lucerne, Switzerland.[12] Further, based on published news reports, I have reason to believe that employees and agents of the various Trafigura affiliates communicate across affiliates by email.[13] In light of the apparent overlap of the entities and shared decision-making, I have a reasonable expectation that Trafigura AG will have relevant information and documents relating to the Trafigura Deal.

24.  Specifically, we believe that Trafigura would have documents and information relevant to the ADR purchase, including the final transaction documents. It is also likely that Trafigura would have information relating to any side agreements that require Trafigura to vote for the slate of directors preferred by Interros and complicit management at the March 2011 EGM and the June 2011 AGM, as well as the source of financing for its purchase of the shares and the identities of Norilsk management, professional advisors and any others who were responsible for the deal.

E.   THE DISCOVERY NEEDED IN THIS ACTION

25.  In my role as director of Norilsk, I have justifiably sought information and documentation from the Board of Norilsk, Interros and from Corbiere in an effort to discharge my duties to act in the best interests of Norilsk under Art. 71 of the Russian Federal Law on Joint Stock Companies and Section 8.5 of the Charter of Norilsk. Some of my concerns about the lack of transparency concerning the Trafigura Deal and the Buyback Deal are recorded in my letter written to the board of directors of Norilsk after the meeting on 28 December 2010. (This letter is referred to as my "special opinion" at paragraph 67 of my Nevis Affidavit, which is attached as Exhibit 3). Further requests will also be made of Corbiere shortly following the filing of this application.

---

[11]  *See* Ex. B.

[12]  Ex. Y (Trafigura internet website showing office locations).

[13]  Ex. H (Trafigura emails regarding toxic waste scandal).

26.     I am concerned to ensure that Norilsk and Rusal's interests are best protected. I am also personally concerned from a corporate governance perspective to ensure that I fully discharge my duties as a director of Norilsk and Rusal. Regrettably, I have been unable to get any straight answers to the questions that I have asked. I therefore seek the Court's assistance to enable Rusal to pursue effective legal action against the wrongdoers and to enable me to properly discharge my directors' duties.

27.     Accordingly, I have continued to seek the information and documentation necessary to answer the following key questions, among others: (1) what are the terms (and especially the underlying terms) of the Trafigura Deal and how do those terms affect the control of the shares and any rights associated with them; (2) is it a share parking scheme, who has (or does not have) the right to vote the shares and when; (3) if it is a share parking scheme, for whose benefit is it and for what consideration; (4) who is behind the improper scheme, who planned it and who implemented it; (5) if and to what extent this transaction differed from a genuine arm's length transaction; (6) who are the parties to it; and (7) who financed the acquisition of the shares by Trafigura, how and when?

28.     Despite my role as a director of Norilsk, I have been unable to obtain any of the key information and documentation from Norilsk management, which I have reason to believe is complicit with Interros and others in a scheme to seize control of Norilsk in violation of applicable law and Rusal's contractual rights.

29.     To protect its legal rights and to litigate its claims effectively before the LCIA and the courts of Russia and Nevis, Rusal urgently needs the relief sought for several reasons.

30.     *First*, the Russian court has ordered Rusal to produce the documentation. According to the order of the Russian arbitrazh court (case No A33-266/2011), the proceeding has not yet been commenced because the claimant – United Company Rusal Investment Management, LLC - has not introduced any evidence to prove that the disputed transactions exist.[14] The court required submission of evidence proving that Corbiere and Raleigh and Trafigura had entered into the transactions. The court, therefore, deferred the claim until February 14, 2011, at which date the claim will be returned to the claimant without consideration if it does not provide evidence of the transactions as required by the court. However, the claimant will retain the right to re-file the claim in the future if the evidence is collected.

31.     *Second*, Rusal has made requests to obtain the documents and information from Interros, Norilsk and Trafigura and they have refused to provide the relevant documents and information. On 5 January 2011, Mr. Deripaska wrote to Trafigura in which he asked for disclosure of the agreement with Trafigura for the sale of shares and information about the financing of the transaction and any agreement concerning the voting rights for the shares or any other similar agreement.[15] On 12 January 2011,

---

[14]  *See* Ex. T.

[15]  Exhibit 4.

Trafigura responded by email and by letter in which it stated that "*all of the arrangements relating to our acquisition of an interest in the share capital of [Norilsk] are subject to entirely customary confidentiality undertakings and as such we are not able to answer any of the questions or provide any of the confirmations or information that your letter seeks.*"[16] Trafigura invited Rusal to direct its enquiries to Norilsk.

32.    *Third*, there is no other reasonable way that Rusal can obtain this information and documentation.  According to Article 66 (2) of the Russian Arbitrazh Procedure Code, an arbitrazh court is entitled to suggest to persons participating in a case that they present additional evidence to clarify the factual circumstances so that court may correctly consider the case.  However, there is no statutory obligation to comply with such suggestion; it is voluntary on the part of party, a severe impediment in a case such as this one involving intentionally deceptive conduct.  There is certainly no equivalent of Federal Rule of Civil Procedure 45 that would enable us to take discovery of third parties which may well be the most effective means of uncovering the identity of the relevant wrongdoers and the key features of this improper scheme to seize control of Norilsk.  Without access to this information, Rusal may not be able to properly plead a case.  On the other hand, it is likely that the Russian court would be receptive to discovery obtained pursuant to 28 U.S.C. § 1782.  The Russian Arbitrazh Procedure Code (relevant sections of which are attached hereto as Exhibit 2) does not contain any restrictions on relevant discovery obtained abroad.  It does set forth the general rule on the admission of evidence: any relevant evidence which obtained legally is admissible.  It also  contains open-ended list of admissible evidence, none of which would preclude evidence obtained pursuant to Section 1782.  Russian Arbitrazh Procedure Code  article 64 (2).  Finally, the Russian Arbitrazh Procedure Code explicitly provides a procedure for submitting evidence collected abroad.  *See*, article 75 (5-7) of the Russian Arbitrazh Procedure Code.  Therefore, I conclude that the Russian court would be receptive to discovery and evidence obtained in the United States pursuant to Section 1782.

33.    *Fourth*, the Trafigura Deal was a transaction between Norilsk's "*indirect subsidiaries, including Corbiere*" and Trafigura.[17] Rusal suspects that Raleigh (based in Nevis) was also a party to the transaction. Rusal does not know which other indirect subsidiaries were party to agreement(s) with Trafigura. Given the complex network of subsidiaries and SPVs around the globe, it is likely that there are other entities who are party to the transaction that Rusal has been unable to identify. Any successful application made to obtain disclosure orders in the Nevis court against Corbiere (and possibly Raleigh) will not result in Rusal necessarily obtaining the information and documentation relating to the transactions between other indirect subsidiaries and Trafigura. For example, any onward arrangements concerning the shares or finance arrangements between Trafigura and other entities will not be discovered by an application in Nevis against Corbiere (and possibly Raleigh).

---

[16]    Exhibit 5.

[17]    Ex. J at 36.

34. *Fifth*, Corbiere and Raleigh are offshore entities that do not have any actual operations of which I am aware. They are managed by registered agents (including Hamilton Trust Company (Nevis) Limited) who take instructions from other persons who are likely to be resident outside Nevis and who are likely to have taken steps to maintain distance and create barriers in order to frustrate any attempts by Rusal to gain access to the relevant documentation and information. It is unlikely that the information and documentation sought by this application that pertains to the underlying scheme and to the Trafigura Deal are held in offices in Nevis. Accordingly, any effort to obtain discovery directly from Corbiere and Raleigh, either through the Nevis court proceeding or otherwise, is unlikely to be successful.

35. *Sixth*, Rusal cannot obtain this information via the LCIA arbitration because, as described in the accompanying Declaration of Ronnie King, a partner at the Ashurst law firm which serves as Rusal's lead counsel in that arbitration, LCIA rules do not have a mechanism for compelling discovery from third parties. Given that the only actual party to the LCIA arbitration is Interros, Rusal would in all likelihood not be able to use this proceeding to obtain the discovery it needs regarding the Buyback or the Trafigura Transaction which took place among nonparties Corbiere, Raleigh and Trafigura.

36. Rusal has also engaged other solicitors in London, the Mishcon de Reya law firm, to seek relevant discovery related to these proceedings from third parties believed to be in London through a procedure available in England known as a *Norwich Pharmacal* application. Our pending *Norwich* application does not seek evidence from Trafigura AG or any of its affiliates.

37. Accordingly, the order sought is necessary to enable Rusal to advance its claims.

F.    URGENCY

38. This application is urgent.   As explained above, Rusal has already initiated proceedings in Russia and Nevis seeking interim relief. There are a number of key dates and deadlines that are approaching and the success of this application will have a bearing on imminent future events. The most pressing of these deadlines arises from the fact that the Russian court has directed  Rusal to produce further information and documentation to support its claims by 14 February 2011, as discussed above in paragraph 30.  In the Nevis action, the court has set a hearing date of 2 March 2011 for Rusal's application for interim injunctive relief.  A critical upcoming date for Norilsk is 11 March 2011 when the company will hold an extraordinary general meeting of shareholders (the "March 2011 EGM").   As detailed in my Nevis Affidavit at paragraphs 46 to 52, Rusal demanded an extraordinary shareholder meeting for the purpose of electing a new board to restore balance for all shareholders and to prevent harmful transactions similar to the Trafigura deal and the Buyback Deal from happening in the future.  In both the Russian action and the Nevis action, Rusal is seeking interim relief on an expedited

basis vindicating its rights as a shareholder. In the LCIA arbitration, Rusal seeks to enforce its contractual rights as a party to the Cooperation Agreement. Among the panoply of relief that Rusal is seeking are injunctive orders barring Interros, Corbiere and Raleigh, and those acting in concert with them, including Trafigura, from voting their improperly obtained shares at the March 2011 EGM in order to ensure that there will be a free and fair board election.

39.     The disclosure of the information and documents sought by this application is necessary to shed light on the true circumstances of the challenged transactions and to enable Rusal to plead its claims properly. Obtaining such disclosure on an expedited basis is essential for Rusal to pursue its applications for interim relief before the Russian and Nevis courts and to assist those courts in the just adjudication of those cases.

40.     Finally, I am also concerned for personal reasons to ensure that I take whatever corporate action is necessary now to properly discharge my duties to Norilsk and Rusal.

G.   **CONCLUSION**

41.     For the reasons set out above, I respectfully request that the Court grant the application.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.



Signed:   **/s/ Maxim Sokov**

(Print name):  **MAXIM SOKOV**

**Executed On: February 10, 2011**

# Exhibit 1

1. Applicant
2. Maxim Sokov
3. First
4. Dated 1 February 2011
5. Exhibits MS1

IN THE EASTERN CARIBBEAN SUPREME COURT
HIGH COURT OF JUSTICE
ST. CHRISTOPHER & NEVIS
NEVIS CIRCUIT
(CIVIL)
A.D. 2011

CLAIM NO. NEVHCV2011/

In the Matter of an Application pursuant to Part 8.1(6)(b) and Part 11 of the Eastern Caribbean Civil Procedure Rules 2000

*And*

In the Matter of a Claim by United Company Rusal plc. and United Rusal Investment Management LLC where remedies are sought in relation to proceedings which are taking place in another jurisdiction

BETWEEN:

1. **UNITED COMPANY RUSAL PLC**
2. **UNITED COMPANY RUSAL INVESTMENT MANAGEMENT LLC**

Applicants/ Intended Claimants

– and –

1. **CORBIERE HOLDING LTD.**
2. **RALEIGH INVESTMENTS INC.**

Respondents/Intended Defendants

<u>AFFIDAVIT OF MAXIM SOKOV</u>

I, MAXIM SOKOV, of 13/1, Nikoloyamskaya Street, Moscow, 109240, Russia, MAKE OATH AND SAY as follows: –

1.  I am Director for Corporate Strategy of Rusal Global Management B.V., the management company of United Company Rusal plc. ("UC Rusal plc") group. I am also General Director of United Company RUSAL Investment Management LLC ("UC RUSAL LLC") (UC Rusal plc and UC RUSAL LLC are referred together as the "Applicants" or "Rusal"). UC RUSAL LLC is a wholly owned (indirect) subsidiary of UC Rusal plc, and is the entity through which the Applicants hold an interest in Open Joint Stock Company Mining and Metallurgical Company Norilsk Nickel a.k.a. OJSC MMC Norilsk Nickel ("Norilsk"). Since 2008, I have been a non-executive member of the board of directors of Norilsk.

- 1 -

2.    I graduated from the Russian State Tax Academy and then from New York University School of Law with a Master's of Law degree. I then worked as a lawyer for the Moscow Representative Office of Herbert Smith CIS Legal Services. I am dual qualified in New York and Russian law.

3.    I have worked for Rusal since 2004. I was initially Head of M&A in Rusal's Legal Department. I then headed the Department for Strategic Projects and later was appointed as Director for Investment Management with a major responsibility to manage Rusal's investment in Norilsk.

4.    I am familiar with Rusal and I am duly authorized to swear this Affidavit in support of the relief claimed.

5.    The facts and the matters deposed to herein are from my own knowledge, save where I indicate otherwise.  Insofar as they are within my own knowledge, the facts and matters deposed to are true to the best of my own knowledge and belief. Where I rely on matters not within my knowledge the sources I rely on for my information and on which my belief is based are the persons or documents I refer to or both.

6.    There is now produced to me a tabbed bundle of documents marked and exhibited as "<u>MS1</u>" for identification, and to which I will refer in the course of this affidavit.

A.    <u>PURPOSE OF THIS APPLICATION</u>

7.    The purpose of this application is to obtain interim relief as set forth in the Claimant's ex-parte application. In particular, to enjoin the Defendants from:

(a)    Voting shares held in Norilsk; and

(b)    Disposing of their shares in Norilsk.

8.    It is the Applicants' case that Corbiere Holding Ltd. ("Corbiere") and Raleigh Investments Inc. ("Raleigh") (Corbiere and Raleigh are together the "Respondents" or "Defendants") are involved in a scheme, which is described in more detail below, and which has resulted in significant harm to Rusal.

B.    <u>THE PARTIES TO THESE PROCEEDINGS AND RELATED PARTIES</u>

(1)    <u>Rusal</u>

9.    Rusal's principal activity is the production and sale of aluminium. Rusal is the world's largest producer of aluminium and alumina. It reported group revenue and net profit of US$8,165 million and US$821million respectively for the year ended 31 December 2009. A copy of Rusal's last annual report is available on its website http:‹http://rusal.ru/en/investors.aspx›. In 2009, it accounted for approximately 10% of the global production of aluminium and alumina. In the first half of 2010, it reported revenue of US$5,321million and net income of US$1,268million.

10.   Rusal employs about 76,000 people in 19 countries, across 5 continents. It sells its products primarily in the European, Japanese, Korean, Chinese, South East Asian and North American markets. Its shares are traded on stock exchanges in Hong Kong and Paris. Rusal's registered office is at Whiteley Chambers, Don Street, St Helier JE4 9WG Jersey.

11.   The two Rusal entities are the Applicants herein. UC Rusal PLC is the Claimant in an arbitration which is taking place in England. UC RUSAL LLC is the Claimant in a number of substantive actions which have been commenced in Russia.

(2)    Norilsk and its subsidiaries

12.    Norilsk is a company incorporated under Russian law with Primary State Registration
       Number 1028400000298 . It is the world's largest producer of nickel and palladium and one of
       the leading producers of platinum and copper. It also produces various by-products, such as
       cobalt, chromium, rhodium, silver, gold, iridium, ruthenium, selenium, tellurium and sulfur. It
       employs over 60,000 people. Norilsk's corporate structure is set out at TAB 1 of "MSI".

13.    Rusal owns (directly or indirectly) a 25% + 1 share in Norilsk. Rusal's stake current market
       value is worth approximately USD 12 billion with a significant further growth potential. For
       obvious reasons, Rusal is very keen to protect this significant investment.

14.    Rusal has the right to and has nominated directors to Norilsk's board of directors. I am on the
       board of directors of Norilsk and I am on its audit committee.

15.    This present application principally concerns Norilsk and its indirect subsidiaries - Corbiere
       and Raleigh.

16.    Corbiere is a company incorporated in Nevis under the Nevis Business Corporation
       Ordinance, 1984, as amended with registered agent and office at Hamilton Trust Services
       (Nevis) Ltd., Stoney Grove, Charlestown, Nevis.  At the time of filing, Corbiere is in good
       standing.

17.    Raleigh is also a company incorporated in Nevis under the Nevis Business Corporation
       Ordinance, 1984, as amended with registered agent and office at Hamilton Trust Services
       (Nevis) Ltd., Stoney Grove, Charlestown, Nevis.  At the time of filing, Raleigh is in good
       standing.

18.    As at 20 June 2010, Corbiere and Raleigh held around 8.13% of the shares (my understanding
       is that about 7.2341% were held in shares and the remaining balance was held in Level 1
       American Depositary Receipts ("ADRs"). The shares (which were 7.2341%) were converted
       into ADRs sometime between 1 July 2010 and 30 September 2010.  ADR holders may only vote
       through ADR Depositary – the Bank of New York International Nominees –at general
       meetings and exercise other rights granted to shareholders. As indicated below, Rusal
       subsequently discovered that Corbiere and apparently Raleigh had entered into transactions
       to sell their ADRs in Norilsk to Trafigura.

19.    On 28 December 2010 Norilsk's board of directors approved a Shareholder Value
       Enhancement Programme (the "Programme"). The Programme was proposed so as to increase
       the company's capitalization. The first phase of the Programme involved a plan to return cash
       to shareholders through buyback tender offers and open market purchases. It was proposed
       that the buy-back of shares be structured utilizing Corbiere. A copy of the press release
       announcing the Programme is at TAB 2 of "MSI". Rusal was opposed to the Programme, and
       the buy-back. Notwithstanding, the Programme was approved by Norilsk's board of
       directors. This transaction (and the underlying arrangements between the parties) is central
       to this application and is described in more detail below.

(3)    Interros

20.    Interros International Investments Limited (a company formed and existing under the laws of
       Cyprus) ("Interros") asserts publicly to hold a 25% plus 1 share in Norilsk or more. Interros is
       one of the largest private investment companies in Russia. It was founded by Vladimir
       Potanin.

21.    Interros through its affiliates also has to the right to and has nominated directors to Norilsk's
       board of directors.

22.   Rusal and Interros have been engaged in a protracted and bitter dispute with respect to the ongoing management and direction of Norilsk. This dispute has evolved over several years. Although formal agreements have been entered into (see paragraph 26 below) with a view to resolving the parties' differences and reaching common ground, the relationship remains fractious and is subject to ongoing litigation and arbitration as described in this affidavit. On the basis of past conduct and the evidence available to the recent transactions described below, I believe that Interros and its nominated directors on the board of Norilsk are behind an unlawful scheme to damage Rusal's interests in Norilsk. I believe that they have implemented and are behind this scheme in order to force Rusal to sell its stake in Norilsk to Interros and/or Norilsk itself. I also believe that Corbiere and Raleigh are involved in this scheme and indeed form an integral part of it, for the reasons described throughout this affidavit.

(4)   <u>Trafigura</u>

23.   An entity within the Trafigura group, Trafigura Beheer B.V. ("Trafigura") is also relevant to the present application. According to its website ‹http://www.trafigura.com›, Trafigura is the world's third largest independent oil broker and the second largest independent trader in the non-ferrous market, with approximately US$20billion in credit facilities and investments in industrial assets around the world of more than US$1.5billion. It trades over 9 million tons of metals and raw minerals per annum.

24.   On 20 December 2010, Rusal discovered that Corbiere and apparently Raleigh had entered into transactions to sell their ADRs in Norilsk to Trafigura. This transaction (and the underlying arrangements between the parties) is also important to this application and is described in more detail below.

C.   <u>COOPERATION AGREEMENT AND INTERROS'S CONDUCT</u>

25.   As described above this claim is presented against the backdrop of a complex and significant multi-jurisdictional dispute between Rusal and Interros.   Such dispute includes arbitration proceedings between Rusal and Interros in London. These proceedings have been brought by Rusal in order to enforce a cooperation agreement dated 25 November 2008 between Rusal and Interros in respect of Norilsk (the "Cooperation Agreement").   The arbitration proceedings are confidential. Insofar as the proceedings are relevant to Rusal's claim against the Defendants, I summarize them below, confining myself to information about the Cooperation Agreement, and the proceedings, which has been released into the public domain by the parties.

26.   The Cooperation Agreement provides, among other things, that Rusal and Interros should each use their best efforts to ensure the election of the maximum number of directors to the board of directors of Norilsk from each of them equally.   It also provides that the parties should seek to ensure the election of a Mr. A.S. Voloshin as a director of Norilsk and as chairman of the board of directors of Norilsk (Source: Rusal press release 11 August 2010 exhibited at TAB 3 of "MSI").

27.   At Norilsk's annual general meeting on 28 June 2010 (the "2010 AGM"), three directors nominated by Rusal and four directors nominated by Interros were elected to the board of directors of Norilsk. Mr. Voloshin was not elected as a director of Norilsk and was not appointed as chairman of its board of directors. Rusal alleges that Interros breached the Cooperation Agreement by failing to vote its shares so as to (1) ensure the election of four directors nominated by the Company and (2) ensure Mr. Voloshin's election as director and as chairman of Norilsk (Source: Rusal press release 11 August 2010 at TAB 3 of "MSI").

28.   Rusal commenced proceedings in the form of arbitration in the London Court of Arbitration to enforce its rights under the Cooperation Agreement. The said proceeding is now ongoing

with case number 101666 ("the LCIA claim"). Interros are vigorously defending the proceedings. In particular, Interros takes the position that the Cooperation Agreement is not binding, is unenforceable under Russian law and that it has accepted Rusal's repudiatory breaches (Source: Interros press release 19 October 2010; TAB 4 of "MS1").

29. One of the issues for determination in the LCIA claim relates to an allegation by Rusal that Interros breached its obligation under the Cooperation Agreement to join with Rusal in vetoing a buy-back scheme (described below) that Rusal opposed. In light of confidentiality obligations, both under the Cooperation Agreement and in accordance with the LCIA Rules, Rusal is not able to divulge the parties' submissions with respect to this issue. However, with a view to ensuring that the Court is provided with full and frank disclosure, I note that Interros does not accept Rusal's allegations with respect to the breach of the veto obligation. This difference of view will be resolved in the LCIA Claim.

## D.   THE UNLAWFUL SCHEME AND THE INVOLVEMENT OF THE RESPONDENTS

### (1)   Introduction

30. In the context of the existing LCIA Claim and the overarching dispute between Rusal and Interros, this application has been triggered by two corporate transactions which were announced just over a week apart from each other on 20 and 29 December 2010. The first transaction involves the sale of shares by Corbiere and Raleigh to Trafigura ("Trafigura Deal"). The second transaction involves a series of proposed share purchases by Corbiere ("Buy-Back Deal").

31. It is important to note that I do not know the precise terms of the Trafigura Deal, what other arrangements are in place between Norilsk/Interros, their associates and Trafigura, or who made them.

32. I have a better understanding of the Buy-Back deal since much of the relevant material is contained in publicly available documents. However, I have been unable to show the connection between the persons behind it and the links between Interros, Corbiere and Raleigh which I believe must exist. In any event, the transactions need to be considered together to understand Rusal's grave concerns.

33. These transactions have been designed to damage Rusal's interest in Norilsk. The details of these unlawful transactions will demonstrate how they inter-connect, and how they threaten to cause substantial and imminent harm to Rusal's interests.

34. I specifically believe that both of the transactions have been designed by Interros and/or those amongst Norilsk's management who are affiliated to Interros as part of an overall scheme to give Interros effective control of Norilsk whilst circumventing the safeguards for shareholders contained in Russian law and exposing the directors to possible regulatory actions in other markets and jurisdictions where the shares and ADRs are traded. The transactions are also commercially absurd and on their face will lead to significant losses for Norilsk and therefore its shareholders.

35. There are a number of reasons for my belief, including: (1) the corporate context in which these transactions arise; (2) the coincidence in the timing of them; (3) the contemporaneous statements made by Mr. Potanin of Interros to the press; (4) the clandestine nature of the Trafigura deal and the lack of visibility that I have of it notwithstanding my position as a board director of Norilsk; and (5) the denial of my requests for further information. I believe that both transactions have been designed for an improper ulterior purpose. I believe that they have been devised by those behind the scheme to enable Interros to exercise extra voting rights at forthcoming shareholders' meetings whilst avoiding Russian rules designed to protect shareholders from improper conduct.

(2)     The Trafigura Deal

36.     On 20 December 2010, Norilsk's management announced that it had entered into agreements with Trafigura to sell American Depositary Receipts ('ADRs') representing shares in Norilsk, held by Norilsk's indirect offshore subsidiaries "at market price" ", which at the date of the announcement of the deal was <u>USD$217 per share</u> to Trafigura. The release states that "*the proceeds from the sale will be used for general corporate purposes.*" These ADRs comprise approximately 8% of Norilsk's outstanding and issued share capital ("**Norilsk Balance Sheet Shares**") and according to the release said proceeds "*... from the sale will be used for general corporate purposes.*' ("Trafigura Deal"). A copy of Norilsk's press release is at TAB 5 of "MSI".

37.     The indirect offshore subsidiaries in question are Corbiere and Raleigh. The shares held by Corbiere and Raleigh amount to 8.13% of ADRs.

38.     The board of Norilsk was given no notification that this significant transaction between Norilsk's subsidiaries and Trafigura was being contemplated. Directors affiliated to Rusal on the board did not find out about the transaction until they saw Norilsk's press release stating that agreements had been entered into with Trafigura. The transaction was an absolute surprise to me. Rather than being considered, and voted on, by the board of Norilsk, the transaction was approved by the boards of Norilsk's offshore subsidiaries which comprise representatives of Norilsk's management and/or secretarial companies accountable to Norilsk management. As a result, Rusal had no opportunity even to review, let alone prevent this transaction being undertaken.

39.     Norilsk's press release also stated that '*In connection with the sale, Trafigura entered into a lock-up pursuant to which it undertook not to sell the MMC Norilsk Nickel ADRs acquired in the transaction to a non-affiliated third party until after June 30, 2011.*' The press release gave no explanation for this lock-up provision. By entering into a 'lock-up' with Trafigura until end June 2011, Interros and Norilsk's management have ensured that the Norilsk balance sheet shares (i.e. any share and ADRs which are held by Norilsk's direct or indirect subsidiaries) will not be transferred to a party which might not vote in accordance with management's wishes at the 2011 AGM. This is intended to prevent any possibility that the Norilsk balance sheet shares will be voted in support of Rusal's nominees at the 2011 AGM. I also believe that Trafigura, and Norilsk's management, have (directly or indirectly, formally or informally) agreed that Norilsk's management will be able to control the voting of the shares sold to Trafigura until 30 June 2011. I have not seen any underlying agreement for the voting of shares or such other agreement between Interros and Trafigura (or their nominees) to this effect. However, I strongly suspect that there is in fact such an arrangement.

40.     Virtually none of the details of the deal with Trafigura has been disclosed to Rusal or to the board of directors of Norilsk. Norilsk public announcement simply stated that the shares were acquired on "*market terms*'. The market price on the date of the announcement of the agreements with Trafigura was US$ 217 per share. The market price is significant in the context of the buyback, which I describe below. This is because, having agreed to sell of an 8% parcel of shares to Trafigura at what are claimed to be "*market terms*", Norilsk's buyback (announced 9 days later) provides for the purchase of 6.2% of Norilsk's shares (**6.2% being the initial offer contained in the Offer Memorandum which was later increased to 7.3%**) at a premium of US$35 per share over market price, equating to an overall premium of US$400million. This is explained further below.

41.     Norilsk has also announced that the Trafigura transaction was carried out "*as a cash deal*". I do not understand how this can be the case. Trafigura is a privately held Dutch-based commodities trader. Rusal's suspicions regarding the rationale for the transaction with Trafigura are heightened by the fact that it is widely believed that Trafigura does not have the finance to complete this transaction and that the transaction does not make commercial sense

for Trafigura. I exhibit a copy of an article from the Wall Street Journal at TAB 6 of "MSI" discussing this transaction in which it is reported the value to be around US$3.5billion. The article goes on to state that '*Trafigura Beheer BV may struggle to fund its purchase of a roughly 8% stake in Russia's Norilsk Nickel due to the relatively small size of its balance sheet*', and a source is quoted as observing that '*This deal is very surprising, very unusual*'. The article also refers to a research note from a Russian investment bank, Troika Dialog, which concluded that '*We strongly doubt the capacity of Trafigura to raise this amount alone [...] Trafigura hardly possesses the balance sheet to undertake such investments*.'

42.    I exhibit at TAB 7 of "MSI" a copy of Trafigura's Annual Report for 2010 which is the last publicly available. This reveals that Trafigura's net profit for 2010 (in 2009, the net profit was US$938million) was US$690million on net turnover of US$79.2million (in 2009, net turnover, US$79.242million). Trafigura's total assets were US$25,351million (in 2009, US$19,399million), with long term debt of US$2,551.9million (in 2009, US$2,106million), and other liabilities of US$19,873.5million (in 2009, US$14,869million). Trafigura at that time had net group shareholders equity of US$2,607million (in 2009, US$2,399million), and cash and other short term deposits of around US$1,489million (in 2009, US$1,403). The cash amount reportedly paid for the Norilsk shares is one and a half times Trafigura's last reported total market capitalization and two and a half times its last reported cash reserves. Based on a comparison of the two last years, the financial profile of Trafigura does not suggest a company which can readily make cash investments of over US$3.5billion using its own funds.

43.    Without waiver of privilege, the Russian lawyers acting for Rusal have canvassed the opinion of an expert in this area, to explore how Trafigura could possibly obtain funding for the transaction. I understand that the likely potential structures that it could have used to finance the acquisition of the shares are as follows: -

   (a)    *On balance sheet debt financing*

   (b)    *On balance sheet debt financing - with hedging*

   (c)    *Off balance sheet financing - no hedging*

   (d)    *Off balance sheet financing - with hedging*

   (e)    *Stock lending.*

44.    In addition to the above, it is also important to note that the financing cost to Trafigura on US$3.5 billion deal could be anywhere between US$200million to US$300million per year or higher depending on the structure. Given Norilsk's current share buyback activities, capex program and reluctance to pay cash dividends, Trafigura would need to finance these interest payments (or a part thereof) from its own earnings. This would constitute a large portion of its own profit and loss.

45.    In light of the foregoing, and while there are a number of potential ways in which the transaction could have been financed, it is highly likely that Norilsk and/or Interros (or their nominees) had, through their own banks and financing capabilities, some direct or indirect involvement in facilitating the Trafigura transaction which has not been publicly disclosed or announced, still less has it been disclosed to me as a Director of Norilsk.

46.    <u>Rusal's request for an EGM:-</u> The fact that no details regarding the transaction with Trafigura were provided to the board of Norilsk, and the implausibility of Trafigura having acquired its stake from Rusal, has made Rusal very suspicious. For that reason, on 23 December 2010, Rusal wrote to Norilsk requesting that the board of Norilsk convene an extraordinary general meeting ('EGM') in order to elect a new board. A copy of Rusal's press release is at

TAB 8 of "MSI". In its press release Rusal referred to the Trafigura transaction and explained why it had serious concerns about it. Rusal stated that "*RUSAL requests Norilsk Nickel convene an extraordinary general shareholders' meeting for the removal of the actual Board of Directors and the election of new one, which will restore the balance in the interest of all shareholders, and in order to prevent similar transactions in the future*".

47.    In its press release, Rusal expressed its fear that '*in the near future, the management of MMC [i.e. Norilsk] may announce an additional purchase of their own shares by its subsidiary companies at the expense of the company's shareholders, but in the interests of the management with the use of veiled statements referring to an increase in the company's value. Today's interview of Mr Vladimir Potanin published in the Wall Street Journal which states Interros and MMC's management's intention to obtain a full control of the company and to deprive RUSAL and other minority shareholders of the company to influence the decisions taken is another confirmations to this.*'

48.    The reference to an interview in the Wall Street Journal was to an article referring to an interview with Mr Potanin, published on 23 December 2010. I exhibit a copy of this article at TAB 9 of "MSI". In the article it was reported, in relation to the Trafigura transaction, that "*the deal opens the way for management and Mr Potanin to form a block of shareholders with enough shares to wield effective control, Mr Potanin said. That would "lock up" Rusal's stake, making it less valuable because it would have less influence, he added.*"

49.    Following Rusal's request for an EGM, Norilsk issued a press release in response to Rusal's press release. Norilsk's release was issued only in Russian. A copy of the release and an English translation are at TAB 10 of "MSI". Norilsk expressed itself as "*puzzled*" by Rusal's request for an EGM on the basis of the Trafigura transaction. It claimed that Norilsk '*expects to receive profit from the deal, it is a cash deal and was done on market terms*'. This represents the sum total of Rusal's knowledge of the Trafigura deal (notwithstanding that 1 and two other Rusal affiliated directors sit on the Norilsk board) and is the source of the deal terms referenced at the preceding paragraphs in this section.

50.    Given the secretive nature of the Trafigura deal, which was concealed from Norilsk's own board, the failure of directors affiliated with Interros to raise any concerns regarding the transaction, and Mr Potanin's comments to the press, Rusal's well-founded suspicion is that the deal with Trafigura has been put together as part of Interros's and management's battle with Rusal. Its purpose is to ensure that although a subsidiary of Norilsk no longer has legal ownership of the Norilsk Balance Sheet Shares, Interros and management maintain control of the Norilsk Balance Sheet Shares at least until after the 2011 AGM of Norilsk. It is likely that any such arrangement is documented in some form.

51.    Furthermore, and as I explain below, Corbiere, one of the offshore subsidiaries of Norilsk which participated in the sale of ADRs to Trafigura has since made tender offer to shareholders of Norilsk to 'buy back' shares representing 6.2% of shares which was later increased to 7.3% of the issued and outstanding shares of Norilsk.   Various press releases relating to the tender are at TABS 11 through 13 of "MSI".

52.    On the face of it, there is no legitimate commercial rationale for Norilsk's management to sell roughly 8% of Norilsk's shares to a third party, and then, very shortly afterwards, seek to acquire 7.3% of Norilsk's shares from shareholders.  This is especially so if, as appears to be the case here, the shares that have been sold to Trafigura have been sold for a materially lower price than the price being proposed in the tender offer. In contrast to the optimal business model of buying cheap, and selling dear, the sale to Trafigura was "cheap" and the buyback of shares "dear". This makes absolutely no commercial sense at all. The fact that the two transactions do not make commercial sense when considered together leads me to conclude

that there must be some other clandestine arrangements behind the scenes, in particular to harm Rusal to the benefit of Interros.

(3)   The Buy-Back

53.   The fear expressed by Rusal, in its press release of 23 December 2010, that Norilsk would make an '*additional purchase of their own shares by its subsidiary companies at the expense of the company's shareholders*' was realised later that very same day.

54.   On 23 December 2010 Norilsk's management proposed that the board of Norilsk consider, and vote on, a so-called Shareholder Value Enhancement Program (the "Programme"). The Programme was proposed so as to increase the company's capitalization. I exhibit at TAB 11 of "MSI" a copy of the press release announcing this program. It states that '*The first phase of the Program may include a plan to return cash to shareholders through buyback tender offers and open market purchases of the Company's shares and/or ADRs over the next 12 months in the aggregate amount of up to $4.5 billion. The exact timing and size of tender offers or open market purchases, if any, will depend on market conditions and other factors and will be announced in accordance with applicable legal requirements. No assurance can be given that the Company will implement any tender offers or open market purchases.*'

55.   It was proposed that the buy-back of shares (the "Buy-Back") be structured utilizing Corbiere, an indirect subsidiary of Norilsk, so that Corbiere would be able to purchase up to approximately 11.904 million issued and outstanding shares in Norilsk for a price of US$ 252 per share (which was later increased to 13,888,889 shares). These shares represent 6.2% (and 7.3%) of the issued and outstanding shares of Norilsk respectively. The effect of the proposed Buy-Back was that shareholders in Norilsk would be able to tender their shares in Norilsk to Corbiere and receive payment for such shares from the date of approval by Norilsk's board. A copy of the press release announcing the Programme is at pages 11 of "MSI".

56.   On 28 December 2010 a board meeting of Norilsk was held (the "Board Meeting"). At the Board Meeting, Norilsk's board considered, and voted on, the Programme, which was approved despite Rusal's objections and the exercise of its veto rights under the Cooperation Agreement. I recount the circumstances of the Board Meeting and explain its relevance below.

57.   On 29 December 2010 it was announced that a subsidiary of Norilsk would purchase up to approximately 11.904 million issued and outstanding shares in Norilsk for a price of US$ 252 per share, amounting in total to some US$3billion. These shares represent 6.2% of the issued and outstanding shares of Norilsk. It was subsequently announced that in fact 13,888,889 shares would be purchased, representing 7.3% of the issued and outstanding shares of Norilsk. As of the expiration time of the offer, a total of 13 755 921 were bought back as a result. Copies of the press releases announcing the increase of shares to be purchased and the results of the Offer is at pages 12 of "MSI".

58.   This subsidiary was to be Corbiere. It was proposed that the buy-back of shares be structured utilizing Corbiere, whereby Corbiere, would make a tender offer for shares in Norilsk held by other shareholders.

59.   A copy of the offer memorandum produced by Corbiere is at TAB 13 of "MSI". (the "Offer Memorandum"). I set out some of the relevant terms of the buyback below. It is of note at this juncture that the Offer Memorandum reveals that Norilsk indirect subsidiaries, including Corbiere, entered into agreements with Trafigura to sell ADRs in Norilsk (see page 36 of the Offer Memorandum - at TAB 13 of "MSI).

60.   Rusal's opposition to the Buy-Back: - The draft resolution circulated to directors of Norilsk on 23 December 2010 with regard to the Programme provided for a vote to:

"1.      *Approve the Shareholder Value Enhancement Program*

2.      *Instruct the Company's General Director to carry out actions necessary to implement the Program. If necessary, pursuant to the Company Bylaws, guarantee advance resolutions of the Company's management bodies on the issues relating to their competency'.*

61.     A copy of the original Russian resolution, together with a translation, is at TAB 14 of "MSI".

62.     Although Norilsk's press release, following the Board Meeting, suggested that *'no assurance can be given that the Company will implement any tender offers or open market purchases'* and that any such transactions *'will depend on market conditions and other factors'* it was clear to me, and to the other Rusal affiliated directors on the board, that Norilsk's management intended to implement a buyback immediately. In other words, the decision to proceed with the buyback had already been taken.

63.     This was rationalized having regard to the presentation by Norilsk's management at the Board Meeting of a "Fairness Opinion" prepared by HSBC. HSBC expressly cautioned that the terms of the transaction with Trafigura had not been disclosed to them and that they had not taken into account the terms of that transaction for the purposes of their opinion. I have been involved in a number of heavyweight corporate transactions but have never come across a fairness opinion that does not consider pending material events, like in the case of the HSBC Opinion the just completed Trafigura Transaction.

64.     Our suspicion that the decision to proceed with the Buy-Back had already been taken was confirmed the very next day after the meeting when Corbiere issued the 39 page Offer Memorandum, together with an 11 page Notice of Offer, and various other documents including a Common Shares Letter of Transmittal, ADS Letter of Transmittal and pro-forma share purchase agreements [TAB 15 of "MSI"]. These documents revealed that Citigroup had already been appointed as Dealer Manager and BNY Mellon and Computershare had been appointed as tender agents. It is apparent that these documents must have taken some time to prepare. Norilsk's management must have know that, as a result of the number of directors affiliated to management, and to Interros, on the board of Norilsk, the result of the board vote on the Programme could be guaranteed.

65.     During discussion at the Board Meeting, the three directors affiliated to Rusal on the board of Norilsk, vehemently expressed their opposition to the Programme and the buyback.  Mr Deripaska, Mr Soloviev and I explained clearly, in the strongest possible terms, why we considered that the Programme and the buyback were not in the general interests of Norilsk and should not be approved. These views were consistent with our longstanding and well entrenched opposition to buy-back schemes of this nature. Indeed, there had been lengthy discussions between Rusal and Interros as to buy-backs in December 2009 and March 2010. In these discussions Rusal made clear that for a number of reasons it would always oppose buy-backs proposed by management and would not consent to any buy-back proposals submitted to it by Interros.  I have now had the opportunity to review the Offer Memorandum. Nothing in that document changes my view that the buyback should not have been approved.

66.     Paragraph 5.19 of the Regulations of the Board of Directors of Norilsk (the **'Board Regulations'**) provides that a director who does not agree with an adopted resolution of the board may express his special opinion in writing regarding the matter which shall be appended to the protocol of the meeting of the board.

67.  I submitted a special opinion setting out my opposition to the board after the Board Meeting. In summary, my concerns were as follows:

(a)  eight days prior to the Board Meeting Norilsk's management had announced the sale of the Norilsk Balance Sheet Shares to Trafigura;

(b)  there was no rational economic basis for the sale of such shares in Norilsk to Trafigura *and* the proposal of the buyback of Norilsk's shares from other parties in a comparable volume;

(c)  that is because, if the NN Balance Sheet Shares were sold to Trafigura on *"market terms"* i.e. at the market price on the date of the announcement (US$ 217 per share), and the shares to be acquired in accordance with the buyback were to be acquired at US$ 252 per share, this series of transactions would result in a loss to Norilsk of US$ 35 per share (representing the difference in price between the shares sold, and the shares acquired).

68.  My view was, and remains, that it makes no sense for Norilsk generally, and Corbiere specifically, to sell an 8% shareholding in Norilsk to Trafigura, and then immediately follow this up with an acquisition of a 6.2% shareholding (which was subsequently increased to 7.3%). This is particularly so where there is such a marked difference between the (lower) price of shares sold, and the (higher) price of shares acquired.

69.  The arrangements only make sense if they are viewed as a part of a scheme, the object of which is to concentrate shares, or the voting rights attaching to such shares, in the hands of Norilsk management and Interros. If, as I strongly suspect, Trafigura has undertaken or arranged by some means to vote the 8% of shares acquired in accordance with the directions of the vendors/Norilsk management (at least until 30 June 2011), this means that, following the buyback of 6.2% of Norilsk's shares (which was subsequently increased to 7.3%), Norilsk's management/Interros will be able to direct the voting of in excess of 15% of Norilsk's shares, instead of around 8% of the shares. A likely reason for this structuring is to conceal the fact that 'foreign' shareholders, including Corbiere, will be moving from controlling 8% of Norilsk to controlling 15% of Norilsk, and thus exceeding the statutory trigger for approval from the Federal Antimonopoly Service ("FAS") under the Strategic Investment Law of the Russian Federation. I will deal with this point within the context of the Russian claims below.

70.  I have calculated that if all 10% of the Norilsk shares were bought by Corbiere at US$252 per share, the premium to the price paid by Trafigura represents US$ 700 million. I have used the 10% figure as the Programme provides for the purchase of Norilsk's shares in the aggregate amount of up to US$4.5billion. If such shares are acquired at US$252 per share, this would mean that approximately 10% of Norilsk's shares would be acquired. Even if only 6.2% (which was in fact increased to 7.3%) of Norilsk's shares are acquired by Corbiere, the overpayment will still be in excess of US$400million.

71.  My Rusal colleagues on Norilsk's board, Mr Deripaska and Mr Soloviev, also submitted special opinions along the same lines as mine.

72.  Despite Rusal's clear opposition to the Programme, and the buyback, the Programme was approved by Norilsk's board of directors by a 8 to 4 majority with the three management representatives (Mr Strzhalkovsky, Mr Pivovarchuk and Mr Kostoyev), the four representatives affiliated to Interros (Mr Klishas, Mr Bugrov, Mr Bakal and Ms Zakharova), the VTB representative and Chairman of the board (Mr Titov) and one of the independent directors (Mr Mills) voting against.  Representatives affiliated to Rusal voted against the proposal.  The second independent director, Mr Holden, was not present for the vote, having left the Board Meeting early in order to catch his flight.

- 11 -

73.   <u>Terms of the Buyback:</u> - The Offer Memorandum, a copy of which is at TAB 13 of "MSI" disclosed that: -

    (a)   the offer to shareholders commenced at 5 p.m. Moscow time on 29 December 2010, and would expire at 4 p.m. Moscow time on 21 January 2011;

    (b)   Corbiere would not acquire any shares (or ADRs) from shareholders, nor pay anything for such shares (or ADRs) until expiration of the offer period -21 January 2011;

    (c)   Corbiere 'also expressly reserved the right, in its sole discretion, at any time and from time to time, to, "[...] terminate the Offer and not accept for purchase, or pay for, any Common Shares or ADSs [...] for any [...] reason." This means that Corbiere would not bound by any acceptances of its offers from shareholders until 21 January 2011. During the offer period it could terminate the buyback without being under any further obligation to shareholders;

    (d)   Corbiere warned shareholders in Norilsk that Rusal may seek an injunction against the buyback, preventing it from proceeding: "*UC Rusal in October 2008 challenged in the Russian courts the validity of a prior buyback of shares, and we cannot rule out that there may be litigation challenging the Offer. Any such litigation could, in addition to seeking monetary damages, also seek to enjoin completion of the Offer, which could delay payment made in respect of any tendered securities or prohibit Corbiere from returning any securities tendered by it while such litigation is pending.*';

    (e)   Corbiere set out that it had not obtained external finance to finance the buyback. Corbiere stated that the transaction would be financed by it's own cash reserves, and intercompany loans from other Norilsk group companies; and

    (f)   Corbiere would be entitled to vote any shares acquired by Corbiere at general meetings at its own discretion. The Offer Memorandum states that "*Corbiere has not yet determined how it will vote such securities*" at the 11 March 2011 EGM.

74.   On 21 January 2010 Corbiere issued a press release, a copy of which is at TAB 12 of "MSI" which disclosed modifications of certain key terms of the Offer Memorandum: -

    (a)   An increase in the maximum number of Common Shares and ADSs to be purchased in the Offer to 13,888,889.

    (b)   Where the maximum number of securities, as increased pursuant to this announcement, were properly tendered prior to the expiration time, the tendered securities would be purchased on a pro rata basis according to the number of securities tendered.

    (c)   Payments for the additional tendered securities would be made from funds on hand, loans provided by companies within the Norilsk group and, if required, external financing, to pay for tendered securities pursuant to the Offer.

75.   The offer having expired on 21 January 2011 Corbiere, pursuant to the terms and conditions of its Offer Memorandum, may now purchase from each securityholder of Norilsk who has properly tendered its Common Shares or ADSs.

76.   As noted above, the reference to the voting of shares is significant as Rusal has called for an EGM of Norilsk which has been convened for 11 March 2011. The agenda for the EGM will include a vote on early termination of the current board of directors and election of a new board of directors. Rusal previously called for an EGM in October 2010 at which a resolution

for the termination of the board of directors elected at the 2010 AGM was defeated. This was largely due to opposition from Interros, and Norilsk's management through their ability to vote the Norilsk Balance Sheet Shares.

77.    I believe that the reference to Corbiere not yet having determined how it will vote the shares acquired is misleading and deliberately so. Norilsk's management has previously and consistently voted shares in Norilsk held by its subsidiaries in order to elect representatives of management to Norilsk's board. The timing of the buyback provides for the expiration of the offer to shareholders some two weeks prior to the date on which shareholdings have to be held in order to participate in the 2011 EGM (currently set for 11 March 2011). This timescale gives Norilsk's management plenty of time to acquire shares from shareholders and vote them at the EGM. The consequence is that the buyback will give Interros, and Norilsk's management, a large block of votes which can be used to make it impossible for Rusal to obtain sufficient support to replace the current board and reinstate equilibrium at board level. This is particularly the case if, as I believe is very likely, the Norilsk subsidiary vendors will retain voting rights over the shares sold to Trafigura until 30 June 2011. The result will be that the percentage of shares controlled by Norilsk's management will rise from the 8% controlled at the date of the 2010 AGM, to controlling in excess of 15%. Norilsk's management, and Interros, together will control over 40% of Norilsk's shares. This will make it virtually impossible for Rusal to achieve sufficient support from minority supporters to dismiss the current board of directors.

78.    Further, it is apparent that there is no intention to cancel the shares following the buyback, meaning that the shares will be able to be voted at the direction of Norlisk management. This appears from the Offer Memorandum where, under the heading *'Why is Corbiere making this offer, and how is Corbiere related to Norilsk Nickel?'* it is explained that the offer *'provides Corbiere with a block of securities that may be needed for financial or business purposes'* and that *'Corbiere will be considered the owner of the securities, entitled to vote the securities at its own discretion [...].'* There is no proper financial, or business, purpose for Corbiere to possess and vote these shares. If this were a genuine buy-back scheme designed to return value to shareholders, the shares would be bought and then cancelled. Further, if there were a good reason for holding Norilsk shares, Corbiere, and other Norilsk subsidiaries, would not have sold 8% of Norilsk's shares to Trafigura only the previous week at a lower price. Moreover, it is plain that Corbiere does not act independently of Norilsk. First, the Offer Memorandum noted that the Buy-Back deal was made pursuant to a Norilsk shareholder value enhancement program approved by Norilsk's Board. Second, Corbiere's buy-back offer was financed by Norilsk. Third, the HSBC fairness opinion was addressed to both Norilsk and Corbiere, indicating that the advice was been sought by two companies acting together (parent and wholly owned subsidiary). Fourth, the almost instantaneous approval by Corbiere's board of directors of the Buy-Back following the Norilsk Board of Directors approval of the Shareholder Enhancement Programme indicates not only a significant degree of coordination but also that once the Norilsk Board had approved the advent of the Buy-Back deal was a fait accompli.

79.    The Buy-Back Deal shall change the effectiveness of Rusal's shares because as a result of the Buy-Back Deal the Norilsk Management/Interros bloc may control nearly 40% of Norilsk shares and would thereby minimize Rusal's influence on the Norilsk Board of Directors. This is because the management of Norilsk will, subject to Rusal's application to this court regarding Corbiere's right to vote its shares in Norilsk, control the shares which have been acquired by its subsidiary, Corbiere, as a result of the buyback. The management will be able to exercise the voting rights conferred by these shares. Norilsk's management have previously voted shares held by their subsidiaries in this manner. As explained above, I believe that management will also control the shares which have been sold to Trafigura. This means that, following the buyback, Norilsk's management will control almost 15% of Norilsk's shares. Norilsk's management, and Interros, together, will control over 40 % of Norilsk's shares.

80. Moreover, given management's closeness to Interros, it is likely (again subject to Rusal's related application to this Court) that such voting rights will be used to further increase Interros's influence over Norilsk, to the detriment of Rusal, and other shareholders. The likelihood of Rusal being able to procure the election of its affiliated candidates to the board of Norilsk will be greatly reduced, leaving Interros, and Norilsk's management, free to pursue all manner of schemes to the detriment of Norilsk, without any possibility of effective oversight by Rusal. The risk of such schemes being put into effect is illustrated by the fact that Interros and Norilsk's management have been able to force through the buyback without regard to Rusal's opposition.

81. Interros, and management, will likely also use their increased control over Norilsk to try to force Rusal to sell its stake in Norilsk. In recent months, Norilsk has placed great pressure on Rusal, encouraging it to sell its stake in Norilsk back to the company.

82. On 25 October 2010, Interros wrote to Rusal's Chairman offering to start negotiations for the sale of Rusal's stake in Norilsk. Interros' press release stated that "*Vladimir Potanin is ready to head a pool of investors which may include on board Interros, Norilsk Nickel Pension Fund, MMC (i.e. Norilsk) itself, as well as a number of Russian and western financial investors. In the address to Mr Vekselberg [Rusal's Chairman] the sum of $9 bn is presented as a market price of the above-mentioned shares*".

83. On the same day, Rusal issued a press release publicly rejecting Interros' approach. A copy of the press release is at TAB 16 of "MSI" and discloses that Rusal expressed its concern that Norilsk's management was considering participating, together with Interros, in a buy out of Rusal's interest. Rusal criticised public statements of Norilsk's CEO that Norilsk might use Norilsk's reserves to finance an acquisition of Rusal's stake. Rusal also observed that Interros' proposal could not be serious because if Interros were to acquire Rusal's stake, Interros would own in excess of 30% of the shares in Norilsk and would thus be obliged to make a mandatory offer to Norilsk's shareholders.

84. It is against this background and Rusal's rejection of Interros' offer that Norilsk made its own subsequent offer to acquire Rusal's shareholding in the company. This was also rejected by Rusal. I exhibit at TAB 17 of "MSI" a copy of the release made by Norilsk on 27 December 2010, the eve of the Board Meeting at which the Buyback was approved, in which Norilsk publicises its attempts to force Rusal to sell. Norilsk states that "*We have to state that in case the negotiations on the proposed transaction fail, MMC Norilsk Nickel will have to implement other means to neutralize negative effects of the shareholders' conflict on current operation of the Company and its strategic development. Striving to increase the shareholder value of the Company, MMC Norilsk Nickel will be intending to present a general buy-back proposal for approval by the Board of Directors*".

85. Norilsk has now acted on its threat to propose a buy-back in the event of Rusal's refusal to sell its stake in Norilsk, a stake which Rusal considers to be '*strategic*', and has no intention of selling. It is likely that, following the buyback, Norilsk's management will adopt further, more extreme, means to '*neutralize*' Rusal's opposition to it. The deadline imposed by Norilsk for Rusal's response to its offer to purchase was 15.00 hours (Moscow time) on 28 December 2010. The Norilsk Board Meeting at which the buyback was approved commenced at 16.00 hours.

(4)   The Related Russian Claims

86. On 13 January 2011, Rusal commenced proceedings to challenge (amongst other matters) the Trafigura and buyback transactions. It issued proceedings and applications for injunctive relief in the Krasnoyarsk Krai Arbitrazh Court in the Russian Federation. Certified English translations of the two statements of claim and two motions seeking injunctive relief are at TAB 18 of "MSI". A third set of proceedings was issued by Rusal but these have not been included as they are not directly relevant to this present application.

87.    The two relevant proceedings in Russia include:

(a)    Rusal's claims against: (1) Corbiere, (2) Raleigh Investments Inc, (3) Trafigura, (4) The Bank of New York International Nominees, (5) The Bank of New York Mellon and (6) Norilsk to challenge (i) the conversion of the shares to ADRs and (ii) the validity of the Trafigura transaction (Claim Number A33-266/2011) (the "**Russian Trafigura claim**"); and

(b)    Rusal's claims against Corbiere and Norilsk in which Rusal challenges the validity of the buyback (Claim Number A33-267/2011) (the "Russian buyback claim").

88.    I set out further detail of these two claims below.

(i)    <u>The Russian Trafigura claim</u>

89.    In the Russian Trafigura claim, Rusal claims seeks:

(a)    a declaration that the conversion of the shares held by Corbiere and Raleigh into ADRs deposited with The Bank of New York International Nominees is invalid;

(b)    a declaration that the sale and purchase of the ADRs as entered into by Corbiere and Raleigh, on one part, and Trafigura, on the other part is invalid; and

(c)    a restitution to be applied by transferring ADRs back to the sellers and converting those ADRs into shares.

90.    The primary basis for these claims under Russian law is that Mr Potanin, Norilsk, Interros, Corbiere, Raleigh (and others) constituted a single group of persons in accordance with clause 14, part 1, article 9 of Federal Law No. 135-FZ dated 26 July 2006 "On Protection of Competition". If this is right and the Interros group acquired more than 30% of the shares of Norilsk and was required to make a mandatory offer to the other Norilsk shareholders to purchase their shares. The law giving rise to this mandatory obligation is article 84.2 of Federal Law No. 208-FZ dated 26 December 1995 "On Joint-Stock Companies".

91.    Rusal claims that the conversion of the shares into ADRs to be held by The Bank of New York International Nominees served no economic purpose. It was merely intended to hide the acquisition by the Interros group of more than 30% of the voting shares in order to avoid the mandatory offer and a corresponding restriction of the right to vote with the shares at the EGM on 21 October 2010. By doing this, Corbiere and Raleigh (and others) sought to circumvent the relevant provisions of Russian law.

92.    On 14 January 2011, the Russian Courts considered certain procedural issues and made a ruling to suspend the hearing of the Russian Trafigura claim. A translation of the ruling is at TAB 19 of "MS1". The Court found that the claim had to be suspended because (amongst other matters) there was a lack of particularity insofar as the claims against The Bank of New York entities and Norilsk were concerned and, crucially for present purposes the ruling stated as follows:

"*In accordance with sub-clause 3, clause 1, article 126 of the Russian Federation Arbitrazh Procedure Code, a claim shall be filed along with documents that evidence the circumstances on which the plaintiff's claims are based.*

*In violation of the said statutory requirement, the plaintiff failed to file any documents evidencing the transactions disputed by the plaintiff, namely: underlying documents evidencing the conversion of ... shares ... into the American Depositary Receipts, <u>as entered</u>*

*into between Corbiere Holdings Limited and Trafigura Beheer B.V., and Raleigh Investment Incorporated and Trafigura Beheer B.V.*

93.   The Court ordered Rusal to *"remedy the violations due to which the hearing of the Claim is suspended, by filing...by February 14, 2011....documents evidencing the transactions in question...".* If the documents evidencing the transactions in question are not filed by the deadline (and the other procedural defects are not cured by then), the papers filed in relation to the Russian Trafigura claim will be returned to Rusal.

94.   The Russian Courts have also suspended any hearing of Rusal's motion for interim relief pending the provision of the documentation and Rusal addressing the other procedural issues. I believe that Rusal will be able to quickly remedy the procedural issues.

(ii)   The Russian buyback claim

95.   In the Russian buyback claim, Rusal seeks to invalidate the public offer made by Corbiere and Rusal challenges the voting rights of any shares acquired by Corbiere through the buyback. Its claim is against both Corbiere and Norilsk.

96.   On 14 January 2011, the Russian Courts made a similar ruling to that set out above in relation to the Russian Trafigura claim. A copy of the ruling in the Russian buyback claim is at TAB 19 of "MSI". The hearing of the claim has been suspended pending further particulars of the claim against Norilsk and proper evidence of payment of the court fee and certain other documentation. The Russian Court will not hear the motion for interim relief in this claim until these procedural defects have been cured. Rusal has until 11 February 2011 to cure the procedural defects.

E.   <u>UNDERTAKING AS TO DAMAGES AND CONCLUSION</u>

97.   I am authorised to provide an undertaking on behalf of the Applicants as to damages, if such an undertaking is required.

98.   For the reasons set out above, I respectfully invite the Court to make an order in the terms sought.

(1)  Applicant
(2)  Maxim Sokov
(3)  First
(4)  Dated1February 2011
(5)  Exhibits MSI

IN THE EASTERN CARIBBEAN SUPREME COURT
HIGH COURT OF JUSTICE
ST. CHRISTOPHER & NEVIS
NEVIS CIRCUIT
(CIVIL)
A.D. 2011

CLAIM NO. NEVHCV2011/

> In the Matter of an Application pursuant to Part 8.1(6)(b) and Part 11 of the Eastern Caribbean Civil Procedure Rules 2000

> *And*

> In the Matter of a Claim by United Company Rusal plc. and United Rusal Investment Management LLC where remedies are sought in relation to proceedings which are taking place in another jurisdiction

BETWEEN:

(1)  UNITED COMPANY RUSAL PLC
(2) UNITED COMPANY RUSAL INVESTMENT MANAGEMENT LLC

Applicants/ Intended Claimants

- and –

(1)  CORBIERE HOLDING LTD.
(2)  RALEIGH INVESTMENTS INC.

Respondents/Intended Defendants

**AFFIDAVIT IN SUPPORT OF MAXIM SOKOV**

*(Norwich Pharmacal)*

Attn: Mark Brantley/ Elizabeth Harper/ Midge Morton

DANIEL BRANTLEY & ASSOCIATES
SOLICITORS FOR THE APPLICANTS
Juris Building,Main Street
PO Box 480
Charlestown, Nevis
Tel: 1 869 469 5259
Fax: 1 869 469 1162
Email: mark.brantley@danielbrantley.com; elizabeth.harper@danielbrantley.com;
midge.morton@danielbrantley.com

# Exhibit 2

# ARBITRATION PROCEDURAL CODE OF THE RUSSIAN FEDERATION NO. 95-FZ OF JULY 24, 2002
## (with the Amendments and Additions of July 28, November 2, 2004, March 31, December 27, 2005, October 2, 2007, April 29, June 11, July 22, December 3, 2008, June 28, July 19, 2009, March 9, April 30, July 27, 2010)

*GARANT system comment*

*This Code shall be put into operation by Federal Law No. 96-FZ of July 24, 2002, as of September 1, 2002, save for the provisions for which said Law establishes other terms and procedures for putting them into operation*

### Adopted by the State Duma of the Russian Federation on June 14, 2002
### Endorsed by the Federation Council on July 10, 2002

*GARANT system comment*

*On some issues of application of the Arbitration Procedural Code of the Russian Federation, see Information Letter of the Presidium of the Higher Arbitration Court of the Russian Federation No. 82 of August 13, 2004*

*On some issues arising in judicial practice, while trying cases on administrative fffences, see Decision of the Plenary Session of the Higher Arbitration Court of the Russian Federation No. 10 of June 2, 2004*

*As to the certain issues arising in connection with the application of anti-monopoly legislation, see Resolution of the Plenary Session of the Higher Arbitration Court of the Russian Federation No. 30 of June 30, 2008*

## Chapter 7. Evidence and Substantiation

### Article 64. Evidence

**1.** Evidence with regard to a case shall be data on the facts thereof obtained in the procedure provided for by this Code and other federal laws which serves as a basis for establishing by an arbitration court the presence or absence of circumstances substantiating the claims and objections of the persons participating in the case, as well as other circumstances important for the correct consideration of the case.

**2.** There shall be admitted as evidence written and material evidence, explanations of the persons participating in a case, expert opinions, testimonies of witnesses, sound recordings and videotapes, other documents and materials.

By way of proofs, the explanations of the persons taking part in the case and of the other participants in the arbitration process, received through the use of video-conference communication systems, are admissible.

**3.** There shall not be allowed use of evidence obtained by breaking federal laws.

### Article 66. Presentation of, and Remanding Evidence

**1.** Evidence shall be presented by the persons participating in a case.

Copies of the documents submitted to court by a person participating in a case shall

be directed to other persons participating in the case if they do not have these documents.

**2.** An arbitration court shall be entitled to suggest to persons participating in a case to present additional evidence for clarifying the circumstances important for the correct consideration of the case and the adoption of a lawful and reasonable judicial act prior to the start of the court session or within the time term fixed by the court.

**3.** In the event of changing the circumstances subject to substantiation in connection with the claimant changing the ground or subject of his claim and the filing by the respondent of a counterclaim, an arbitration court shall be entitled to establish the time period for presenting additional circumstances.

**4.** A person participating in a case and lacking the opportunity to obtain himself necessary evidence from a person possessing it shall be entitled to file a petition to the arbitration court for demanding for the given evidence.

In the petition there should be denoted the evidence and indicated what circumstances significant for the case may be established by this evidence, as well as the reasons impeding the obtainment of the evidence, and the location thereof.

In the event of satisfying the petition the court shall obtain on demand appropriate evidence from the person who has it.

**5.** In the event of non-presentation by state power bodies, bodies of local self-government, other bodies and officials of evidence in cases arising from administrative and other public legal relations, an arbitration court shall obtain on demand evidence from these bodies on its own initiative.

Copies of documents obtained on demand by an arbitration court on its own initiative shall be directed by the court to the persons participating in the case if they do not have these documents.

**6.** An arbitration court shall issue a ruling in respect of demanding evidence.

In the ruling there shall be indicated the term and procedure for presenting evidence.

A copy of the ruling shall be directed to the persons participating in the case, as well as to the person who has the evidence called for by the court.

**7.** The person who has the evidence called for by an arbitration court shall send it directly to the court. In case of necessity, at the request of the court the evidence which is called for may be handed in to the person having an appropriate request for presenting to the court.

**8.** Where the person from whom an arbitration court demands presentation of evidence has no opportunity to present it or to present it within the time period established by the court, he shall be obliged to notify the court about this and to indicate the reasons for non- presentation thereof within a five-day term, as of the date of obtaining a copy of the ruling for demanding the evidence.

**9.** In the event of failure to discharge the duty of presenting evidence called for by an arbitration court for reasons recognized by the arbitration court as not good, or of failure to notify the court on the impossibility of presenting evidence at all or within the established time period, the court shall impose on the person whom the evidence is demanded of a court fine as per the procedure and in the amount established in Chapter 11 of this Code.

**10.** A court shall issue a ruling in respect of imposing a court fine.

In a ruling concerning the imposition of a court fine there shall be established a new time period when the evidence called for has to be presented.

In the event of failure to meet these requirements within the time period indicated in a ruling concerning the imposition of a court fine, an arbitration court may repeatedly impose the fine according to the rules provided for by Part 9 of this Article.

**11.** The imposition of court fines shall not relieve the person who has the evidence

which is called for of the duty to present it to the arbitration court.

**12.** A ruling of an arbitration court concerning the imposition of a court fine may be appealed.

### Article 75. Written Evidence

**1.** Written evidence shall be taken to be contracts, acts, references, business mail and other documents in the form of digital or graphical records, or in any other form which contain data on the circumstances significant for a case and allow to establish the reliability of a document.

**2.** Records of court sessions, records of committing individual procedural actions and enclosures thereto shall likewise pertain to written evidence.

**3.** The documents received by the facsimile, electronic or another kind of communication, including with the use of the Internet, as well as the documents signed by an electronic digital signature or another analogue of the sign manual, are admissible as written proofs in the cases and in accordance with the procedure, established in the present Code and in the other federal laws and the other normative legal acts or in a contract, or defined within the scope of its authority by the Higher Arbitration Court of the Russian Federation.

If the copies of documents are presented to the arbitration court in electronic form, the court may demand that the originals of these documents be submitted.

**4.** Documents submitted to an arbitration court which confirm the commitment of actions relevant in law have to meet the requirements established for the given type of documents.

**5.** To written evidence made in whole or in part in a foreign language there shall be attached properly certified translations thereof into the Russian language.

**6.** A document obtained in a foreign state shall be recognized by an arbitration court as written evidence if it is legalized in the established procedure.

**7.** Foreign official documents shall be recognized by an arbitration court as written evidence without the legalization thereof in the instances provided for by an international treaty of the Russian Federation.

**8.** Written evidence shall be submitted to an arbitration court in the original or in the form of a properly certified copy. Where only a part of a document is relevant to a tried case, a certified extract from it shall be submitted.

**9.** Originals of documents shall be submitted to an arbitration court when the circumstances of a case under a federal law or other normative legal act are only subject to confirmation by such documents, as well as upon the request of an arbitration court.

**10.** Originals of the documents contained in a case file may be returned to the persons who have submitted them on the basis of their applications after the entry into legal force of a judicial act terminating the consideration of the case, if these documents are not subject to delivery to another person.

Simultaneously with the applications said persons shall submit properly certified copies of the documents or shall apply for certifying by the court the correctness of the copies left in the case file.

**11.** Where an arbitration court comes to the conclusion that the return of original documents shall not be detrimental to the correct consideration of a case, these documents may be returned in the course of proceedings concerning the case prior to the entry into legal force of the judicial act terminating the consideration of the case.

# Exhibit 3

В Совет директоров
ОАО «ГМК «Норильский никель»

Копия:
Секретарю Совета директоров
ОАО «ГМК «Норильский никель»
О.В. Сурикову

от члена Совета директоров
ОАО «ГМК «Норильский никель»

М.М. Сокова

**Особое мнение**
по вопросам №№ 1, 3-8 повестки дня
заседания Совета директоров
ОАО «ГМК «Норильский никель»,
проведенного «28» декабря 2010 года

На заседании Совета директоров ОАО «ГМК «Норильский никель» (далее также «Компания»), проведенном «28» декабря 2010 года, я голосовал «ПРОТИВ» по ряду вопросов повестки дня.

Настоящим считаю необходимым детально пояснить свою позицию по голосованию в порядке пункта 5.19 Положения о Совете директоров Компании, утвержденного решением годового Общего собрания акционеров (протокол от 03.07.2009 года).

I.   *По вопросу 1 повестки: О бюджете Общества на 2011 год.*

Материалы (презентация «Ожидаемые результаты финансово-хозяйственной деятельности Общества за 2010 год. План Общества на 2011 год.»), рассматриваемые в рамках вопроса повестки дня СД Компании «О бюджете Общества на 2011 год», включали в себя параметры лишь российских предприятий Компании (без учета дочернего общества ОАО «ОГК-3») и не включали ее зарубежные активы, что было прямо указано на слайде 3 рассматриваемых материалов. В связи с этим, документы и материалы, представленные членам Совета директоров Компании, не являются полноценным консолидированным бюджетом Компании и могут рассматриваться лишь в качестве составной части бюджета Компании в части российских активов.

В консолидированном бюджете Компании, очевидным образом, должны быть отражены все активы и дочерние общества, включая иностранные, подлежащие консолидации в рамках консолидированной финансовой отчетности Компании, составленной по стандартам МСФО. Учитывая значительный объем зарубежных инвестиций Компании, принятие взвешенного и сбалансированного решения — как по консолидированному бюджету Компании на 2011 год в целом, так и по бюджету в части российских активов в частности — возможно исключительно в контексте тщательного анализа указанных материалов, особенно в ситуации увеличения программы капитального строительства более чем в два раза до 84,7 млрд. рублей. Предлагаемая программа капитального строительства без понимания свободного денежного потока иностранных обществ Компании, подлежащих консолидации в рамках стандартов МСФО и включению в единый бюджет, несет значительные риски для самой Компании и может повлечь

значительный ущерб в случае снижения цен на металлы от целевых показателей, указанных в рассматриваемых материалах.

Таким образом, членам Совета директоров – как в порядке подготовки к заседанию, так и в ходе заседания – не были представлены документы и материалы, достаточные для принятия взвешенного и сбалансированного решения по вопросу о Бюджете Компании на 2011 год. В результате члены Совета директоров Компании были лишены возможности учитывать всю экономически значимую информацию о Компании при голосовании по вопросу о бюджете на 2011 год.

Более того, несколько членов Совета директоров задали целый ряд вопросов к представленным материалам, что требует дополнительного обсуждения в рамках Комитета по бюджету при Совете директоров. Тем не менее, предложение перенести рассмотрение бюджета на следующее очное заседание Совета директоров, с целью его доработки с учетом рекомендаций Комитета по бюджету, было отклонено.

В этой связи, я голосовал «против» по данному вопросу.

2. *По вопросам 3-7 повестки: касательно обмена акций ОАО «ОГК-3» на акции ОАО «Интер РАО ЕЭС»*

*Вопрос 3: О прекращении участия Компании в ОАО «ОГК-3»*

*Вопрос 4: Об участии Компании в ОАО «Интер РАО ЕЭС»*

*Вопрос 5: О сделке по отчуждению Компанией обыкновенных именных бездокументарных акций ОАО «ОГК-3» в обмен на приобретение обыкновенных именных бездокументарных акций ОАО «Интер РАО ЕЭС».*

*Вопрос 6: О сделке по заключению Компанией Договора об обязательствах (Deed of Covenant)*

*Вопрос 7: О порядке голосования на внеочередном Общем собрании акционеров ОАО «Интергенерация»*

Полагаю, что сделкой по обмену акций ОАО «ОГК-3» (далее – «ОГК-3»), принадлежащих Компании, на акции ОАО «Интер РАО ЕЭС» (далее – «ИНТЕР РАО») Компании могут быть причинены убытки (ущерб) в размере более 4 млрд. рублей (с учетом отчуждения пакета ОГК-3 с ОАО «Интергенерация», являющейся дочерним обществом Компании, в рамках решения по вопросу 7 повестки) по следующим причинам:

Во-первых, имущество, подлежащее обмену, не является равноценным. Так, пакет акций ОГК-3, принадлежащий (прямо или косвенно) Компании (включая пакет акций ОГК-3, принадлежащий ОАО «Интергенерация»), рыночной стоимостью 62,8 млрд. рублей (средняя цена за 6 месяцев) обменивается на акции ИНТЕР РАО, рыночная стоимость которых на организованных рынках существенно ниже - всего 59,9 млрд. рублей (средняя цена за 6 месяцев). Иными словами, акции ИНТЕР РАО приобретаются с премией, существование которой нельзя объяснить экономическими причинами. Как следствие, в реальности Компания отчуждает акции ОГК-3 по заниженной цене, в ущерб интересам своих акционеров.

При этом, независимый инвестиционный банк Barclays Capital, который был нанят Компанией с целью подтвердить справедливость сравнительной оценки стоимости ОГК-3 и ИНТЕР РАО в своем письме от 26 ноября 2010 года указал, что «невозможно оценить ИНТЕР РАО, и, следовательно, выразить мнение в отношении справедливой стоимости акций Интер РАО». В письме от 30 ноября 2010 года, в котором Barclays Capital выразил мнение по поводу справедливости предполагаемой стоимости акций ОГК-3, Barclays Capital повторно указал, что «мнение [Barclays Capital] никаким образом не касается

вопроса о справедливости или стоимости каких-либо акций Интер РАО» и что предполагаемая цена акций Интер РАО была указана им клиентом, т.е. Компанией.

В соответствии с общеэкономическим подходом к формированию цены акций публичных компаний, продавец вправе рассчитывать на премию к цене обращения акций на бирже при отчуждении блокирующего или, тем более, контрольного пакета, поскольку такой пакет акций не может быть свободно приобретен покупателем (он предоставляет, в той или иной мере, право корпоративного контроля).

Миноритарный пакет акций ИНТЕР РАО не позволит Компании участвовать в управлении его делами. Обмен контрольного пакета акций на неконтрольный с уплатой премии, очевидно, не представляет какой-либо инвестиционной ценности для Компании.

Во-вторых, в результате обмена акций ОГК-3 на акции ИНТЕР РАО Компания недополучит доход, который она могла получить от сделки по конкурирующему предложению на более выгодных условиях. Компанией было получено предложение от ОАО «ЕвроСибЭнерго» о приобретении последним около 79% акций ОГК-3 за 2.1 млрд. долларов США (что на 28 декабря 2010 года, дату заседания Совета Директоров Компании, составляло более 63,9 млрд. рублей). Установленная в рамках данного предложения цена акций ОГК-3 превышает рыночную стоимость акций ОГК-3, определенную на основании 6-месячной средневзвешенной цены акций на бирже, более чем на 1 млрд. рублей, а рыночную стоимость акций ИНТЕР РАО, предлагаемых для обмена, более чем на 4 млрд. рублей.

Таким образом, очевидно, что совершение сделки по обмену акций ОГК-3 на акции Интер РАО повлечет убытки (ущерб) для Компании в размере более 4 млрд. рублей.

Кроме того, проект Договора мены акций ОАО «ИНТЕР РАО ЕЭС» и ОАО «ОГК-3», включает ряд пустых форм (например, Приложение 4 «Форма Гарантии»), которые, по моему мнению, могут содержать существенные условия, требующие одобрения Советом директоров Компании.

В этой связи, я голосую «Против» по вопросам 3-7 повестки.

3.  *По вопросу 8 повестки: О рассмотрении программы повышения капитализации Компании*

Программа повышения капитализации Компании, предложенная для одобрения Советом Директоров, предусматривает, кроме прочего, выкуп с премией к рынку собственных акций Компании и американских депозитарных расписок, выпущенных на акции ОАО «ГМК «Норильский никель» («АДР»), на сумму до 4.5 млрд. долларов США (т.е. около 10% акций и/или АДР). Данное решение вызывает серьезные вопросы в свете заявления ОАО «ГМК «Норильский никель» от 20 декабря 2010 года (за 8 днями ранее даты заседания настоящего Совета директоров) о продаже около 8% собственных акций Компании, принадлежащих ее дочерним обществам, компании Trafigura Beheer BV (далее – «Trafigura»)[1].

Реализация сделки по продаже АДР компании Trafigura с одной стороны и объявленный выкуп собственных акций и/или АДР Компании в сопоставимом объеме с другой с разницей в 8 дней, вызывает самые серьезные опасения в связи с отсутствием рациональных экономических оснований совершения Компанией таких сделок.

Более того, в отсутствии точной информации об условиях сделки по отчуждению АДР и о финансовых возможностях Trafigura Beheer BV есть основания полагать, что: (1) сделка может быть совершена с существенным дисконтом в цене АДР по сравнению с их

---

[1] Пресс релиз Компании от 20 декабря 2010 года - http://www.nornick.ru/press/news/3129/

200

рыночной стоимостью, либо (2) Trafigura Beheer BV не является конечным приобретателем АДР и финансирование сделки по продаже АДР осуществляется организацией, «дружественной» по отношению к Компании или к одному из ее акционеров, либо что (3) указанная сделка не является денежной, не предполагает каких-либо последующих доходов для Компании, а направлена на обеспечение возможности голосования менеджмента Компании этими акциями.

Так, условия сделки с Trafigura могут включать различного рода опционы и обязательства Trafigura действовать и голосовать этим пакетом в интересах менеджмента Компании, позволяя последнему сохранять фактический контроль над 8% голосов на общем собрании акционеров, используя их в собственных интересах, что также подтверждается информацией, содержащейся в пресс-релизе Компании, где указано, что Trafigura не может реализовать приобретаемый у Компании пакет АДР до годового собрания акционеров в июне 2011 года.

Даже, если основываться на сообщении самой Компании[2] о том, что сделка о продаже АДР компании Trafigura совершена на рыночных условиях, реализация программы повышения капитализации Компании, в части предусматриваемого выкупа собственных акций и/или АДР с премией к рынку, повлечет убыток (ущерб) для Компании.

Так, на 20 декабря 2010 года (дату пресс релиза о сделке с Trafigura) рыночная стоимость акций Компании составляла 217 долларов США за акцию, тогда как предложение о выкупе в рамках программы повышения капитализации предполагается в размере $252 долларов США за акцию, что приводит к убытку для Компании в размере 35 долларов США на каждую акцию или более 20 млрд. рублей в пересчете на 10% акций, которые предполагаются к выкупу в рамках программы повышения капитализации.

Полагаю, что реализация подобного обратного выкупа АДР в контексте сделки с Trafigura неизбежно повлечет убыток для Компании. Таким образом, подобная сделка является крайне невыгодной для Компании, и ни в коей мере не может быть обоснована необходимостью повышения стоимости компании.

В этой связи, я голосую «Против» по данному вопросу повестки дня.


Данное особое мнение подлежит приложению к протоколу заседания Совета директоров ОАО «ГМК «Норильский никель», состоявшегося 28 декабря 2010, в соответствии с п. 5.19 Положения о Совете директоров Компании.



С уважением,

Член Совета директоров
ОАО «ГМК «Норильский никель»                                         М.М. Соков


---

[2] Пресс релиз Компании от 23 декабря 2010 года - http://www.nornick.ru/press/news/3132/

Board of Directors
OJSC MMC NORILSK NICKEL

Copy:
O.V. Surikov
Secretary of the Board of Directors
OJSC MMC NORILSK NICKEL

From:
M.M. Sokov
Member of the Board of Directors
OJSC MMC NORILSK NICKEL

Special Opinion
on issues Nos. 1, 3-8 of the agenda
of the OJSC MMC NORILSK NICKEL
Board of Directors Meeting
that took place on December 28, 2010

I voted "AGAINST" in relation to several issues on the agenda during the OJSC MMC NORILSK NICKEL ("Company") Board of Directors meeting that took place on December 28, 2010.

I hereby consider it necessary to explain in details my voting position pursuant to the Company's Board of Directors Bylaws §5.19 (approved by the Annual General Shareholders Meeting; protocol of 03.07.2009).

*1. Agenda Issue No. 1: The Company's 2011 Budget.*

Materials reviewed in the context of the agenda issue of the Company's Board meeting on Company's 2011 Budget (presentation titled "Expected Results of Financial and Commercial Activity of the Company for 2010. Plan of the Company for 2011) contained information only on the Company's Russian enterprises (excluding OJSC OGK-3 subsidiary) and did not contain foreign assets. This was expressly stated on slide No. 3 of the reviewed materials. Hence, documents and materials presented to the Board of Directors do not constitute the Company's full consolidated budget and can only be considered as part of the Company's budget in relation to its Russian assets.

It is evident that the Company's consolidated budget must include all assets and subsidiaries (including foreign) which are subject to consolidation within Company's consolidated financial reporting pursuant to IFRS standards. Taking into account a significant number of the Company's foreign investments, a well-balanced decision on the Company's consolidated 2011 budget in general, as well as on the budget for the Russian assets in particular, is only possible by performing a thorough analysis of the above-referenced materials, especially since there is a

program to increase capital development investment more than twice, up to 84.7 billion rubles. The proposed capital development investment program bears significant risks to the Company itself and might result in significant losses if the metal prices fall below the target prices presented in the materials, if there is no clear understanding of the free cash flow of the Company's foreign companies  (which are to be consolidated pursuant to IFRS standards and included into the consolidated budget).Hence, the Board of Directors was not presented with documents and materials necessary to make a well-balanced and thoughtful decision on the issue of the Company's 2011 Budget (both in preparation for the meeting as well as at the meeting). As a result members of the Board of Directors were deprived of opportunity to consider all material economic information regarding the Company when voting on the issue of 2011 budget.

Moreover, several members of the Board of Directors raised a number of questions on the presented materials.  These inquiries require additional discussion at the Board of Director's Budget Committee.  However, the proposal to move the budget issue to the next Board of Directors meeting (with personal presence), with an aim to amend it taking into consideration recommendations of the Budget Committee, was declined.

In this respect, I voted "against" regarding this agenda issue.

2. *Agenda Issues Nos. 3-7:  The exchange of OJSC OGK-3 shares for OJSC INTER RAO UES shares.*
      *Question No. 3: Termination of the Company's participation in OJSC OGK-3.*

      *Question No. 4: Company's participation in OJSC INTER RAO UES.*

      *Question No. 5: Agreement on the exchange of ordinary registered non-documentary OJSC OGK-3 shares for ordinary registered non-documentary OJSC INTER RAO UES shares.*

      *Question No. 6: Company's potential execution of the Deed of Covenant.*

      *Question No. 7: Voting at the Extraordinary General Meeting of Shareholders of OJSC Intergeneratsia.*

I believe that the agreement on the exchange of OJSC OGK-3 ("OGK-3") shares owned by the Company for OJSC INTER RAO UES shares ("INTER RAO") may result in damages (losses) to the Company in the amount exceeding  4 billion rubles (taking into account the disposal of OGK-3 shares held by OJSC Intergeneratsia which is Company's subsidiary, in the context of the  issue  7 of the Agenda) for the following reasons:

First, the property to be exchanged is not of equal value.  The OGK-3 shares owned (directly or indirectly) by the Company (including OGK-3 shares owned by OJSC Intergeneratsia) with market value of 62,8 billion rubles (median price for 6 months) are being exchanged for the INTER RAO shares of significantly lower market value at organized markets of only 59,9 billion rubles (median price for 6 months).  In other words, the INTER RAO shares are acquired with a premium that cannot be explained by any economic reasons.  As a result, in reality the Company is disposing of the OGK-3 shares for an understated price, against the interests of the Company's shareholders.

- 2 -

At the same time, an independent investment bank Barclays Capital hired to confirm the fairness of OGK-3 and INTER RAO relative value analysis pointed out in its letter of November 26, 2010 that "it is impossible to appraise INTER RAO and, therefore, express any opinion as to the fair value of the INTER RAO shares". In its letter of November 30, 2010, in which Barclays Capital expressed its opinion on the fairness of the proposed value of the OGK-3 shares, the Bank pointed out again that "[Barclays Capital] opinion does not in any way deal with the issue of fairness or value of any INTER RAO shares" and that the client (i.e., the Company) provided the bank with the alleged value of the INTER RAO shares.

Pursuant to the general economic approach to the valuation of public company shares, the seller is entitled to expect a premium on top of the share price on stock market when selling a blocking or, especially, controlling interest in the company. This is due to the fact that the buyer is unable to purchase such interest freely (which presents the buyer with the right of a corporate control to certain extent). Minority interest in INTER RAO will not allow the Company to manage INTER RAO's affairs. The exchange of a controlling interest to a minority interest with a payment of a premium obviously does not present any investment value to the Company.



Second, if the exchange of the OGK-3 shares for the INTER RAO shares takes place, the Company will loose income that it would have received from a transaction based on a more advantageous competing offer. The Company received an offer from OJSC EvroSibEnergo to acquire approximately 79% of the OGK-3 shares for 2.1 billion US dollars (which is equal to 63.9 billion rubles as of the Company's Board meeting date, December 28, 2010). The price of OGK-3 shares stated in the said offer exceeds the market value of the OGK-3 shares (established pursuant to a median stock market price for the 6 months) by more than 1 billion rubles; it also exceeds the market value of the INTER RAO shares offered for the exchange by more than 4 billion rubles.

Therefore, it is evident that entering into a transaction to exchange the OGK-3 shares for the INTER RAO shares will result in damages (losses) for the Company in the amount exceeding 4 billion rubles.

Moreover, the draft Agreement on the exchange of the OJSC INTER RAO UES shares for the OJSC OGK-3 shares includes many blank forms (e.g. Addendum No.4 "Guarantee Form"), which, in my opinion, may contain important clauses requiring approval of the Board of Directors of the Company.

In this respect, I vote "Against" regarding the issues 3-7 of the Agenda.

*3. Agenda Issue No. 8: Review of Company's increase of capitalization program*

The Company's increase of capitalization program proposed to the Board of Directors for the approval entails, among other things, buyback with a premium of the Company's own shares and American depository receipts issued for the shares of OJSC MMC NORILSK NICKEL ("ADR") in the aggregate amount of up to 4.5 billion US dollars (i.e. 10% of the Company's shares and/or ADRs). This decision raises serious concerns in light of the OJSC MMC NORILSK NICKEL's statement of December 20, 2010 (i.e., 8 days before the current Board of

Directors meeting date) regarding the sale of approximately 8% of Company's shares held by its subsidiaries to Trafigura Beheer BV ("Trafigura")[1].

The performance of the agreement to sell ADRs to Trafigura on one hand, and the announcement of the buyback of the Company's shares and/or ADRs in a comparable volume on the other hand, all happening in 8-day period, raise serious concerns due to the lack of rational economic basis for the Company to enter into such transactions.

Moreover, in absence of clear information on terms of the agreement to dispose ADRs and on Trafigura's financial capabilities there are reasons to believe that: (1) the transaction migh be completed with a significant discount in ADRs prices as compared to their market value; or (2) Trafigura might not be the ultimate purchaser of the ADRs and the financing of the transaction is provided by an organization "friendly" to the Company or one of its shareholders; or (3) the said transaction is not monetary, does not provide for any subsequent income to the Company, but rather it is directed at securing the ability of Company's management to vote with these shares.

For instance, the agreement with Trafigura may provide for various options and undertakings on behalf of Trafigura to act and vote by these shares in the interests of the Company's management thus enabling the latter to preserve a de facto control over 8% of shares at the general shareholders meeting and use it in their own interests. The above is also confirmed by the information contained in the Company's press-release which states that Trafigura is not able to sell the Company ADR's prior to the annual general shareholders meeting in June 2011.

Even if judging by the Company's statement the agreement to sell ADRs to Trafigura is made on market terms[2], the implementation of the part of Company's increase of capitalization program which relates to the proposed buyback of the Company's shares and/or ADRs with premium to the market price will result in damages (losses) to the Company.

As of December 20, 2010 (the date of the Company's press release on the agreement with Trafigura) the market price of the Company's shares was 217 US dollars per share. The buyback offer pursuant to the increase of capitalization program is proposed to be 252 US dollars per share, which results in losses to the Company in the amount of 35 US dollars per share or 20 billion rubles for 10% of shares (which are subject to the buyback pursuant to the increase of capitalization program).

I believe that the implementation of such ADR buyback in the context of the transaction with Trafigura will inevitably result in losses to the Company. Therefore, such transaction is extremely disadvantageous for the Company and in no way can be justified by the need to increase the Company's value.

In this respect, I vote "Against" regarding this issue of the Agenda.

---

[1] Company Press Release of December 20, 2010 - http://www.nornick.ru/press/news/3129/

[2] Company Press Release of December 23, 2010 - http://www.nornick.ru/press/news/3132/

- 4 -

205

This special opinion is to be enclosed to the Minutes of the OJSC MMC NORILSK NICKEL Board of Directors meeting that took place on December 28, 2010, pursuant to the Company's Board of Directors Bylaws §5.19.


Sincerely,


M.M. Sokov

Member of the Board of Directors
OJSC MMC NORILSK NICKEL

- 5 -

206

# Exhibit 4



RUSAL

Your ref:

Our ref: 01-01-177

Date: 05.01.2011

Trafigura Beheer B.V.
Board of Directors
Gustav Mahlerplein 102
1082 MA AMSTERDAM

PO BOX 75117
1070 AC AMSTERDAM

Per facsimile: +31 20 441 5840

5 January 2011

Dear Members of the Board of Directors:

According to press reports including your own press release, your company agreed to purchase from subsidiaries of OJSC MMC Norilsk Nickel approximately 8% of that company's outstanding shareholding in what can only be described as an unusual manner.

Our company – UC RUSAL plc – (indirectly) holds 25 percent plus of the shares of Norilsk Nickel and has three nominated members of that company's board of directors. It is also party to a Cooperation Agreement with Norilsk Nickel's other major shareholder, Interros Holdings Company. That Cooperation Agreement grants Rusal certain key governance rights with respect to Norilsk Nickel, including veto rights over transactions involving the shares of Norilsk Nickel and other material transactions. Rusal has commenced arbitration proceedings in London against Interros, alleging breaches of that agreement.

Norilsk Nickel has refused to provide us with information on this sale transaction. In light of this refusal, the fundamental change to the balance of power between the shareholders and the governance of Norilsk Nickel the transaction would bring about, the suspicious nature of the transaction generally, and questions that have been raised (including by the international financial press) regarding the nature and sources of your financing, we are concerned as to whether this transaction is a bona fide arm's length purchase. In the event it is not, such a transaction would violate not only Russian law but also the express terms of our Cooperation Agreement.

13/1 Nikoloyamskaya Str., Moscow, 109240, Russian Federation
Phone: +7 495 720 5170, Fax: +7 495 745 7046, www.rusal.com

207

We will continue to pursue all of our rights against both Norilsk Nickel and Interros to obtain full details of this transaction and a full review by Norilsk Nickel's board of directors. In the meantime, we require that you fully disclose your agreement with Norilsk Nickel and its subsidiaries and any agreement with Interros and any of its affiliates. Such disclosure should include the nature of the financing for the transaction, any agreement between you and the aforementioned parties concerning the voting of the shares you will acquire and any other agreements or understanding regarding the Norilsk Nickel shares. As long as the details of the transaction have not been fully disclosed and we have been satisfied that the transaction is not in breach of the applicable laws and agreements, we demand that you refrain from finalizing and executing the transfer. If we do not receive a satisfactory response to this letter within seven days of your receipt, we will assume that you are unable clearly to disprove the apparent false nature of this transaction, in which case we intend vigorously and fully to pursue all legal remedies. Please provide the required information to Maksim Sokov, sokov@rusal.ru, +7 495 728 49 11.

We reserve all rights, remedies, privileges and powers, and this letter shall not be deemed to be a waiver or release of any such right, remedy, privilege or power.

Sincerely yours,

O. Deripaska,

UC RUSAL plc

**208**

# Exhibit 5

**Elizabeth Fox**

| | |
|---|---|
| **From:** | Rocio Giachino [rocio.giachino@trafigura.com] |
| **Sent:** | Wed 12 January 2011 11:42 |
| **To:** | Josephus Jitta, Anne |
| **Subject:** | Rusal |
| **Attachments:** | Untitled Attachment; Document.pdf |

Dear Mrs Josephusjitta,

Please find attached the email & fax we sent to your client following the letter we received from your office dated Thursday 6 January 2011.

Regards,
Rocio Giachino
*PA to Claude Dauphin*



This email and any attachments are confidential and access to this email or attachment by anyone other than the addressee is unauthorised. If you are not the intended recipient please notify the sender and delete the email including any attachments. You must not disclose or distribute any of the contents to any other person. Personal views or opinions are solely those of the author and not of Trafigura. Trafigura does not guarantee that the integrity of this communication has been maintained nor that the communication is free of viruses, interceptions or interference. By communicating with anyone at Trafigura by email, you consent to the monitoring or interception of such email by Trafigura in accordance with its internal policies. Unless otherwise stated, any pricing information given in this message is indicative only, is subject to change and does not constitute an offer to deal at any price quoted.

**Elizabeth Fox**

**From:** Rocio Giachino [rocio.giachino@trafigura.com] on behalf of Claude Dauphin
[Claude.Dauphin@trafigura.com]
**Sent:** Wed 12 January 2011 10:56
**To:** ceooffice@rusal.ru
**Cc:** sokov@rusal.ru

Dear Mr. Deripaska,

Thank you for your letter dated 5 January 2011, the contents of which we have noted.

All of the arrangements relating to our acquisition of an interest in the share capital of OJSC MMC
Norilsk Nickel (Norilsk Nickel) are subject to entirely customary confidentiality undertakings and as such
we are not able to answer any of the questions or provide any of the confirmations or information that
your letter seeks. Given that the issues that your letter raises arise out of the fact that you are
a material shareholder in Norilsk Nickel we would respectfully suggest that you continue to raise any
concerns or questions you may have direct with Norilsk Nickel rather than ourselves.

We would like to take this opportunity to raise an issue relating to aluminium business between
Trafigura and Rusal. As you are aware, our trading staff have been in contact with your marketing team
many times. However, we are very disappointed with the feedback received from them. We have been
offered minimal amounts of aluminium when considering Rusal's production capacity. Furthermore
when we have bid, we have received negligible feedback as to why we were unable to conclude
anything. We cannot understand why Rusal, as a publically listed company, is prepared to conclude
substantial contracts with another large trading company rather than seeking alternative competitive
offers in the market.

We would appreciate your consideration of this matter.

Yours faithfully,

Claude Dauphin

*For and on behalf of Trafigura Beheer B.V.*

21(



**TRAFIGURA BEHEER B.V., AMSTERDAM, BRANCH OFFICE GENEVA**

<u>**By fax +7 495 745 7046**</u>
Rusal
Attn: Mr. Deripaska
13/1 Nikoloyamskaya Str
109240 Moscow
Russia

Dear Mr. Deripaska,

Thank you for your letter dated 5 January 2011, the contents of which we have noted.

All of the arrangements relating to our acquisition of an interest in the share capital of OJSC MMC Norilsk Nickel (Norilsk Nickel) are subject to entirely customary confidentiality undertakings and as such we are not able to answer any of the questions or provide any of the confirmations or information that your letter seeks  Given that the issues that your letter raises arise out of the fact that you are a material shareholder in Norilsk Nickel we would respectfully suggest that you continue to raise any concerns or questions you may have direct with Norilsk Nickel rather than ourselves.

We would like to take this opportunity to raise an issue relating to aluminium business between Trafigura and Rusal. As you are aware, our trading staffs have been in contact with your marketing team many times. However, we are very disappointed with the feedback received from them. We have been offered minimal amounts of aluminium when considering Rusal's production capacity. Furthermore when we have bid, we have received negligible feedback as to why we were unable to conclude anything. We cannot understand why Rusal, as a publically listed company, is prepared to conclude substantial contracts with another large trading company rather than seeking alternative competitive offers in the market.

We would appreciate your consideration of this matter.

Yours faithfully,

Claude Dauphin

*For and on behalf of Trafigura Beheer B.V.*

211