LEXSEE



Positive
As of: Feb 21, 2011

In the Matter of the Application of VINCENZO NIERI, for subpoenas pursuant to
28 U.S.C. § 1782

Civil Action No. M12-329

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2000 U.S. Dist. LEXIS 540

January 20, 2000, Decided
January 24, 2000, Filed

**DISPOSITION:** [*1] Requests denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff moved to compel the production of documents by defendant in furtherance of lawsuits pending and another to be brought before Italian tribunals; plaintiff claimed that defendant's subsidiaries fired him in retaliation for whistle blowing.

**OVERVIEW:** In retaliatory discharge case, plaintiff moved to compel production. Plaintiff's request for organizational charts was limited to charts reflecting individuals who had participated in or had information concerning plaintiff's termination, and charts reflecting people to whom plaintiff claimed he had given information. Certificates of compliance with defendant's standards of business conduct, signed by plaintiff and named individuals, were ordered produced; but plaintiff's request for certificates signed by people having executive responsibility for activities in Italy was overly broad. Plaintiff asserted defendant's subsidiaries had documented their compliance with standards, which promised to protect whistle blowers. Documents concerning violations of law or defendant's standards by plaintiff, those he reported, and those who told him of

misconduct, could help explain his firing. Therefore, production was ordered. Attorney-client privilege did not protect an in-house investigative report, and defendant did not show whether a self-evaluative privilege applied; defendant was given an opportunity to elaborate.

**OUTCOME:** Plaintiff's motion to compel production was granted in part, denied in part, and judgment was reserved in part; overly broad requests were limited or stricken, other requests were granted, and defendant was given an opportunity to elaborate on its claim that a self-evaluative privilege applied to an in-house investigative report.

**CORE TERMS:** discovery, peer reviews, disclosure, certificates, charts, self-critical, confidential, attorney-client, general counsel, public interest, confidentiality, discoverable, preemption, tribunal, delivery, invoked, advice, candid, overly broad, self-evaluative, organizational, retaliation, subsidiaries, reflecting, admissible, misconduct, wrongdoing, signing, deliver, fired

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Foreign Discovery*
*Civil Procedure > Discovery > Methods > Requests for Production & Inspection*
*Civil Procedure > Discovery > Undue Burdens*

[HN1]A district court is vested with discretion to tailor discovery orders and to prescribe procedure for requests sought under 28 U.S.C.S. § 1782. For example, the limits found in Fed. R. Civ. P. 26(b) on unduly burdensome discovery apply to § 1782 requests. The materials sought need not be discoverable under the laws of the foreign jurisdiction, although preventing circumvention of foreign restrictions on discovery constitutes one valid policy for the district court to consider in exercising its discretion.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > Government Privileges > Official Information Privilege > Self-Critical Analysis Privilege*

[HN2]Courts have formulated the "self-critical analysis" or "self-evaluative" privilege in order to protect a party's confidential analysis of its own performance when such analysis tries to correct problems or otherwise to serve the public interest. It assumes that disclosure of the analysis during litigation may deter future candid reviews.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > Government Privileges > Official Information Privilege > Self-Critical Analysis Privilege*

[HN3]Federal courts can develop common-law privileges under the authority of Fed. R. Evid. 501.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Education Law > Discrimination > Employment > Tenure*

[HN4]Except as otherwise required by the United States Constitution, as provided by Act of Congress, or in rules prescribed by the United States Supreme Court, the privilege of a witness shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. Fed. R. Evid. 501.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Evidence > Privileges > General Overview*

[HN5]The judicial authority to create privileges must be exercised narrowly, given the competing and fundamental principle that probative evidence is generally entitled to disclosure at a public trial.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Education Law > Immunities > Official & Qualified Immunity*

[HN6]Courts are especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Discovery > Undue Burdens*

[HN7]The party resisting discovery must make a detailed and convincing showing of the harm to be anticipated from the disclosure at issue in the particular case. Where a party establishes that disclosure of requested information could cause injury to it or otherwise thwart desirable social policies, the discovering party will be required to demonstrate its need for the information, and the harm it would suffer from the denial of such information would outweigh the injury that disclosure would cause the other party or the interest cited by it.

**COUNSEL:** For Vincenzo Nieri, Plaintiff: Victor Genecin, Pavia & Harcourt, New York, NY.

For Bristol-Myers Squibb, Defendant: Bettina Plevan, Proskauer Rose LLP, New York, NY.

**JUDGES:** WHITMAN KNAPP, SENIOR U.S.D.J., UNITED STATES DISTRICT COURT (PART I).

**OPINION BY:** WHITMAN KNAPP

**OPINION**

**MEMORANDUM & ORDER**

WHITMAN KNAPP, SENIOR DISTRICT JUDGE

Before us is the motion of Vincenzo Nieri to compel the production of documents by Bristol-Myers Squibb Company (hereinafter "BMS") in furtherance of lawsuits pending and another soon to be brought before Italian tribunals. Nieri claims that BMS subsidiaries fired him in retaliation for whistleblowing.

By Order dated July 9, 1999, the Hon. Deborah Batts of this Court granted Nieri's application for judicial assistance before a foreign tribunal, pursuant to 28 U.S.C. § 1782. Nieri served a subpoena on July 19, 1999, and document production ensued, but ten discovery requests remain in dispute.

## I. Legal Standard

[HN1]A district court is vested with discretion to tailor discovery orders and to prescribe procedure for requests sought under 28 U.S.C. § 1782. For example, the limits [*2] found in Federal Rule of Civil Procedure 26(b) on unduly burdensome discovery apply to § 1782 requests. *In re Application of Malev Hungarian Airlines, 964 F.2d 97, 102 (2d Cir.), cert. denied, 506 U.S. 861, 121 L. Ed. 2d 125, 113 S. Ct. 179 (1992).* The materials sought need not be discoverable under the laws of the foreign jurisdiction, although preventing circumvention of foreign restrictions on discovery constitutes one valid policy for the district court to consider in exercising its discretion. *See In re Metallgesellschaft AG, 121 F.3d 77, 79-80 (2d Cir. 1997) (explaining In re Application of G. Aldunate, 3 F.3d 54, 60 (2d Cir.), cert. denied, 510 U.S. 965 (1993)).*

## II. The Specific Document Requests

At the outset, we note that -- as both parties concede -- BMS need only produce documents located within the United States.

## A. Organizational Charts

BMS seeks limits on Nieri's Document Production Requests Nos. 1-6 for organizational charts. We agree that these requests as written are overly broad and would require the production of perhaps dozens of irrelevant charts. We therefore limit production to charts (1) reflecting [*3] the positions of the individuals who participated in the decision to terminate Nieri's employment or those having information regarding his termination; and (2) charts reflecting those people to whom Nieri claims to have spoken or given information,

and their superiors.

## B. Certificates of Familiarity

Request No. 9 seeks production of all "Certificates of Familiarity and Compliance with the BMS Standards of Business Conduct" signed by Nieri and twenty other individuals, as well as certificates for "any person having executive responsibility for any activity of BMS in the Republic of Italy." We strike as vague and overly broad the last clause of this request. We find, however, that the Italian courts might attach legal significance to the signing or not signing of the certificates by employees, and therefore we order the production of these certificates stored in the United States for individuals specifically listed in Request No. 9.

## C. Compliance Reports

BMS's Standards of Business Conduct purport to regulate employee conduct to conform it to various laws. The Standards promise that whistleblowers will not suffer retaliation. Nieri asserts that BMS subsidiaries have [*4] investigated and documented the manner in which they and their employees abide by these Standards. He demands any such documents in Request No. 15. Although we agree with BMS that such documents might be inadmissible at trial, they might well lead to the discovery of admissible evidence. Therefore, we order production relating to this request.

Requests Nos. 16-17 call for documents concerning violations of the law or the BMS Standards (1) by Nieri, (2) by those whose alleged misconduct Nieri reported, and (3) by those who initially told Nieri of such alleged misconduct. Again, we believe that such documents might lead to admissible evidence. The extent and circumstances of any wrongdoing, and the use to which BMS put information of such wrongdoing, might help to explain why the company fired Nieri. We order production relating to these requests.

Finally, we consider whether BMS should be required to deliver an in-house investigative report generated by its international director of security. BMS asserts two reasons why we should not compel such delivery: (1) The report is subject to the attorney-client privilege; and (2) it is subject to the self-evaluative privilege.

BMS's claim [*5] for attorney-client privilege is

supported by the following assertions in the Declaration of John Glover, BMS's vice president of corporate security:

> The report was undertaken to determine whether BMS's Standards of Conduct or Italian law had been violated, in order to assess what steps, if any, were necessary to correct the situation and avoid future violations. The report was... provided only to select high level executives and corporate legal counsel. The report was prepared with the expectation that it would remain confidential, and at all times during the investigation and after, was, in fact, kept confidential.

This Declaration omits more than it asserts. It does not suggest that the international director of security ever asked BMS's general counsel for advice as to whether or how it should proceed in making the report, or that counsel had proffered such advice. Indeed, it does not suggest that counsel had even been aware that a report was being prepared until -- along with other BMS officers -- he received a copy of the final report. Our research has failed to disclose an authority even suggesting that the attorney-client privilege could apply to such facts. [*6] *See, e.g., In re Grand Jury Subpoena (2d Cir. 1979) 599 F.2d 504, 510-11* (even participation of the general counsel "does not automatically cloak the investigation with legal garb").

With respect to BMS's claim that the report fell within the "self-critical analysis" or "self-evaluative" privilege, we note that while neither the Supreme Court nor any circuit court has yet recognized such a privilege, several judges of this Court have done so. We do not have enough information before us, however, to determine whether we should apply the privilege in this case.

[HN2]Courts have formulated this privilege in order to protect a party's confidential analysis of its own performance when such analysis tries to correct problems or otherwise to serve the public interest. It assumes that disclosure of the analysis during litigation may deter future candid reviews. *See, e.g., Trezza v. The Hartford, Inc. (S.D.N.Y. July 20, 1999) No. 98 Civ. 2205, 1999 U.S. Dist. LEXIS 10925, *2.*

[HN3]Federal courts can develop common-law privileges under the authority of Federal Rule of Evidence 501. [1] The self-critical analysis privilege was first invoked in *Bredice v. Doctors Hosp., Inc., 50 F.R.D. 249 (D.D.C. 1970)*, [*7] *aff'd mem., 479 F.2d 920 (D.C. Cir. 1973)*, which protected from discovery in a malpractice suit the minutes of hospital staff meetings concerning ways to improve patient care. The *Bredice* court reasoned that an important public interest is advanced by allowing hospitals to evaluate critically the quality of care they provide without fear of enhancing future liability. This Court soon followed *Bredice* (the only available precedent) and recognized the privilege in a similar factual setting. *Gillman v. United States (S.D.N.Y. 1971) 53 F.R.D. 316.* In decisions over the next twenty years, some judges in this District extended the doctrine. *See, e.g., Mazzella v. RCA Global Communications, 1984 U.S. Dist. LEXIS 18166 (S.D.N.Y. 1984)* No. 83 Civ. 3716, 1984 WL 55541; *but see, e.g., Hardy v. New York News Inc. (S.D.N.Y. 1987) 114 F.R.D. 633, 640-41* (rejecting the privilege).

> 1    [HN4]Except as otherwise required by the Constitution... as provided by Act of Congress or in rules prescribed by the Supreme Court..., the privilege of a witness... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

[*8] Since 1990, some doubt about the doctrine's continuing viability has arisen in light of the Supreme Court's analysis in *University of Pennsylvania v. EEOC (1990) 493 U.S. 182, 110 S. Ct. 577, 107 L. Ed. 2d 571.* In that case, a professor argued that the university refused him tenure based on racial discrimination, and he demanded access to confidential peer reviews written during his application process. The university argued that if the materials were discoverable, peers would not give completely candid evaluations, compromising the integrity of the academic community. The Supreme Court rejected any peer review privilege in this context. The Court stated that [HN5]the judicial authority to create privileges must be exercised narrowly, given the competing and fundamental principle that probative evidence is generally entitled to disclosure at a public trial. *493 U.S. at 189.*

Several subsequent decisions in this District continued to accept the self-critical analysis privilege but

invoked it in a limited fashion, given the Supreme Court's pronouncements. *See, e.g., Troupin v. Metropolitan Life Ins. Co. (S.D.N.Y. 1996) 169 F.R.D. 546, 547-550* [*9] (Sweet, J.); *Chemical Bank v. Affiliated FM Ins. Co., 1994 U.S. Dist. LEXIS 2956*, at *5 (S.D.N.Y. Mar. 16, 1994) No. 87 Civ. 0150 *et al.*, 1994 WL 89292, *2-4 & n.2 (Roberts, Mag. J.) (noting that the peer review privilege is "based largely on the same policy considerations as the self-critical analysis privilege"); *Abbott v. Harris Publications, 1999 U.S. Dist. LEXIS 11410* (S.D.N.Y. July 28, 1999) No. 97 Civ. 7648 (Martin, J.) (declining to extend privilege to kennel club's internal investigation of the processing of plaintiff's application to serve as a dog show judge since club's claim is "far less substantial" than the university's need for confidentiality in peer reviews); *Spencer v. Sea-Land Svc., Inc., 1999 U.S. Dist. LEXIS 12608*, at *4-6 (S.D.N.Y. Aug. 16, 1999) No. 98 Civ. 2817 (Dolinger, Mag. J.). [2]

> 2    Other post-1990 cases have applied the privilege without reference to *University of Pennsylvania. See, e.g., Flynn v. Goldman, Sachs & Co.* (S.D.N.Y. Sept. 16, 1993) *No. 91 Civ. 0035, 1993 U.S. Dist. LEXIS 12801* (Wood, J.); *UBS Asset Mgt. Inc. v. Wood Gundy Corp.* (S.D.N.Y. May 11, 1999) *No. 95 Civ. 5157, 1999 U.S. Dist. LEXIS 6786* (Stanton, J.); *Trezza, 1999 U.S. Dist. LEXIS 10925*, at *3-6 (Fox, Mag. J.).

[*10]  These opinions did not consider that the Supreme Court concentrated on a factor not present in many other cases, namely, Congressional preemption. Thus, the *University of Pennsylvania* case is further distinguishable. The Court found significant Congress's failure to establish a general medical peer review privilege when it enacted a 1986 statute which created qualified immunity for officials conducting such review. Congress apparently considered and rejected the assumption that the delivery of competent health care necessitates strict confidentiality of the review process. *See University of Penn.*, 493 U.S. at 189-92. The Court concluded that, "We [HN6]are especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." *Id. at 189.* [3]

> 3    In *Roberts v. Hunt, 187 F.R.D. 71, 74-76 (W.D.N.Y. 1999)*, Magistrate Judge Foschio canvassed the Southern District of New York

cases in favor of the self-evaluation privilege but concluded that the Supreme Court in *University of Pennsylvania* "implicitly rejected the rationale" for such a privilege. Although Magistrate Judge Foschio considered the Congressional preemption argument in a recent medical peer-review case, she did not do so in *Roberts. Cf. Syposs v. United States, 63 F. Supp. 2d 301 (W.D.N.Y. 1999)*.

[*11]  Perhaps the most cogent statement of a possible test emerging from these various decisions is found in Magistrate Judge Fox's opinion in *Trezza, supra,* at *2 (citations and internal quotation marks omitted):

> [HN7]The party resisting discovery must make a detailed and convincing showing of the harm to be anticipated from the disclosure at issue in the particular case.... Where a party establishes that disclosure of requested information could cause injury to it or otherwise thwart desirable social policies, the discovering party will be required to demonstrate its need for the information, and the harm it would suffer from the denial of such information would outweigh the injury that disclosure would cause the other party or the interest cited by it.

As above indicated, we do not feel that the record now before us is sufficient to permit us to decide whether the privilege should be recognized as here applicable and, if so, what limits we should place on it. As the next step, we order BMS within five days to deliver to chambers a copy of the report for *in camera* inspection.

## III. Costs

Each side seeks costs related to this motion. *See Fed.* [*12] *R. Civ. P. 37(a)(4)*. Since Nieri made some attempt in good faith informally to resolve this dispute, and since BMS's objections to this motion are in some respects meritorious, we deny both requests.

## SO ORDERED.

January 20, 2000

New York, New York

2000 U.S. Dist. LEXIS 540, *12

WHITMAN KNAPP, SENIOR U.S.D.J.·                    UNITED STATES DISTRICT COURT (PART I)

LEXSEE



Positive
As of: Feb 21, 2011

### IN RE APPLICATION OF OOO PROMNEFSTROY FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING.

Misc. No M 19-99 (RJS)

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2009 U.S. Dist. LEXIS 98610

October 15, 2009, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Pursuant to 28 U.S.C.S. § 1782, applicant, a Russian company that claimed to be the lawful owner of a Dutch company, sought an order authorizing deposition and document discovery from respondent, a resident of the State of New York, for use in several pending Dutch proceedings concerning the ownership and control of the Dutch company.

**OVERVIEW:** Applicant's documentary requests did not focus on respondent's personal or business affairs, but focuses almost exclusively on the business practices, litigation, financial statements, bank accounts, calendars, and personnel changes of the Dutch company and related companies that were parties to the Dutch proceedings. Applicant filed its § 1782 application to take discovery from respondent, a former director of the Dutch company's parent company, because Dutch courts had rejected similar requests for the information from more appropriate parties. Although respondent failed to overcome the assumption that the Netherlands would not object to United States assistance, the court held that the discretionary factors weighed against granting the § 1782 application because nearly all the documents that applicant sought were also in the possession of parties to the foreign proceedings, the Dutch courts had rejected

applicant's attempts to procure the same information it sought through its § 1782 application, and the application extended to a wide array of documents related to tens of business entities and to all of their affairs, many of which respondent was not even associated with.

**OUTCOME:** The court denied the application to take discovery pursuant to § 1782.

**CORE TERMS:** finances, tribunal, discovery, oil, discretionary, subpoena, foreign countries, entity, documents relating, jurisdictional, circumvent, foreign jurisdiction, proof-gathering, target, subsidiary, attachment, discovery request, legal action, reside, abroad, twin, discovery rules, foreign government, receptivity, accessible, appointed, approving, receiver, rebuffed, weighs

**LexisNexis(R) Headnotes**

*International Law > Dispute Resolution > Evidence > Assistance*
[HN1]28 U.S.C.S. § 1782, entitled "Assistance to Foreign and International Tribunals and to Litigants before such Tribunals," provides that the district court of the district in which a person resides or is found may order him to

give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. 28 U.S.C.S. § 1782(a). The statute authorizes district courts to grant such relief only where (1) the person from whom discovery is sought resides or is found in the district of the district court where the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by the foreign tribunal or any interested person.

*International Law > Dispute Resolution > Evidence > Assistance*

[HN2]For applications that meet the three statutory prerequisites, Congress planned for district courts to exercise broad discretion over the issuance of discovery orders pursuant to 28 U.S.C.S. § 1782(a). This discretion, however, is not boundless but must be exercised in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in federal courts and encouraging foreign countries by example to provide similar means of assistance to U.S. courts. The Supreme Court of the United States and lower courts have articulated several relevant considerations to further guide the discretion of district courts, including: (1) Whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782 aid; (2) The nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) Whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) Whether the subpoena contains unduly intrusive or burdensome requests.

*International Law > Dispute Resolution > Evidence > Assistance*

[HN3]Where a foreign tribunal has jurisdiction over those appearing before it, the foreign tribunal can itself order them to produce evidence. This rationale suggests that it is the foreign tribunal's ability to control the evidence and order production, not the nominal target of a 28 U.S.C.S. § 1782 application, on which the district court should focus in evaluating whether the documents or testimony sought by the application are within the foreign tribunal's jurisdictional reach.

*International Law > Dispute Resolution > Evidence > Assistance*

[HN4]District courts are only to accept authoritative proof that a foreign tribunal would reject evidence obtained with the aid of 28 U.S.C.S. § 1782. If a respondent does not come forward with any such evidence, district courts generally should err on the side of permitting the requested discovery.

*International Law > Dispute Resolution > Evidence > Assistance*

[HN5]In identifying attempts to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States, district courts may consider how an applicant fared or is faring in the foreign jurisdiction in its attempts to procure the same information it now seeks under 28 U.S.C.S. § 1782.

**JUDGES:** [*1] RICHARD J. SULLIVAN, United States District Judge.

**OPINION BY:** RICHARD J. SULLIVAN

**OPINION**

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Before the Court is the application of OOO Promnefstroy ("Promnefstroy" or "Applicant") for an order pursuant to 28 U.S.C. § 1782 authorizing deposition and document discovery from Daniel Caleb Feldman ("Feldman" or "Respondent") for use in several pending proceedings in the Netherlands (collectively, the "Dutch Proceedings"). For the reasons set forth below, Promnefstroy's application is denied in its entirety.

I. BACKGROUND [1]

1   The facts described below are taken from the application, Feldman's oppositions, and the various exhibits and declarations attached to those documents.

A. Facts

1. The Yukos Oil Bankruptcy

Yukos Oil was a joint-stock company organized under the laws of the Russian Federation in the early

1990s. (Daniel Caleb Feldman's Opp'n To Application for Order to Take Discovery Pursuant to 28 U.S.C. § 1782 ("Feldman Opp'n") 3.) During the late 1990s and early part of this century, Yukos Oil experienced dramatic growth, but then came under fire from Russian tax authorities in late 2003. (*Id.*) After subsequent audits and the imposition of fines, penalties, [*2] and back taxes, a consortium of banks pushed Yukos Oil into bankruptcy in March of 2006. (*Id.*) Eduard Rebgun ("Rebgun") was appointed receiver of the crippled giant. (*Id.*)

One of the assets Rebgun became responsible for as receiver of Yukos Oil was the Dutch company Yukos Finance B.V. ("Yukos Finance"), a wholly-owned subsidiary that held foreign companies in the Yukos Oil group. (Feldman Opp'n Ex. 3 P 2.1 (Dutch decision dated March 21, 2008).) Among Yukos Finance's holdings were all the shares of Yukos International UK B.V. ("Yukos International"), another Dutch company with substantial holdings in the oil and gas industry. (*Id.*) Yukos Finance and Yukos International were overseen by two Yukos Oil executives, David Godfrey ("Godfrey") and Mark Misamore ("Misamore"), who acted as directors of Yukos Finance and Yukos International. (*Id.* P 2.5.).

On August 11, 2006, Rebgun attempted to dismiss Godfrey and Misamore from Yukos Finance and appoint two new directors. (*Id.* P 2.7.) Four days later, Rebgun sold all of the shares of Yukos Finance to Promnefstroy, a Russian "closed joint-stock company." (*Id.* P 2.8.) At that time, Promnefstroy attempted to appoint its own directors, Robert Reid [*3] ("Reid") and Stephen Lynch ("Lynch"). [2] (Feldman Opp'n Ex. 5 P 4.30 (Dutch decision dated February 25, 2009).)

> [2] Rebgun had initially appointed S.S. Shmelkov and L.J. Hogerbrugge as directors of Yukos Finance to replace Godfrey and Misamore, but Promnefstroy replaced them with Reid and Lynch as soon as it purchased Yukos Finance at the bankruptcy sale. (Feldman Opp'n Ex. 3 P 2.7.)

2. Original Dutch Proceeding

Upon their dismissal as directors of Yukos Finance, Godfrey and Misamore brought an action in the Amsterdam District Court, which culminated in a decision dated October 31, 2007. (Feldman Opp'n Ex. 2 (Dutch decision dated October 31, 2007).) This action sought a declaratory judgment that shareholder actions

taken by Rebgun as receiver of Yukos Oil, including the dismissal of Godfrey and Misamore, were null and void. (*Id.* P 2.1.) Godfrey and Misamore also sought a declaratory judgment that all actions taken by Rebgun's appointed directors were likewise null and void. (*Id.*)

The Dutch court found in favor of Godfrey and Misamore, declaring Misamore and Godfrey the lawful directors of Yukos Finance and voiding Rebgun's actions. (*Id.* at 20.) The Dutch court's October 31, 2007 judgment is [*4] currently pending on appeal, now with Promnefstroy as an intervening party. (Application for Order to Take Discovery Pursuant to 28 U.S.C. § 1782 and Request for Expedited Ruling ("Application") 6.)

The various interested parties from the first proceeding have commenced no less than five additional proceedings in Dutch courts since the October 31, 2007 decision. (*Id.*) Each of these proceedings revolved around either establishing ownership and control of Yukos Finance and its related entities, preserving the assets of Yukos Finance and its related entities, or discovering information relevant to those two goals. The Court will briefly recount the portions of those proceedings relevant to Promnefstroy's § 1782 application.

3. Subsequent Dutch Proceedings

a. March 6, 2008 Order

In March 2008, the Dutch courts approved proposed asset sales by Yukos International disposing of a Lithuanian oil refinery and Yukos International's 49% stake in Transpetrol, a Slovakian company. (Application Ex. H. PP 2.41-2.42 (Dutch court decision dated March 6, 2008).) The court also granted Promnefstroy's request for an order requiring Yukos International, Godfrey, and Misamore to deposit proceeds from these [*5] sales in a separate interest-bearing account and not to dispose of the funds. [3] (*Id.* P 6.1.) At least a portion of these funds were placed in an account in Fortis bank (the "Fortis Account") and ordered frozen, pending final resolution of the ownership of Yukos Finance. (*Id.* P 2.43.) This preliminary relief was affirmed on appeal, with the Dutch appellate court concluding that Promnefstroy had an interest in maintaining the assets of Yukos Finance pending its appeal of the October 31, 2007 ruling. (Application Ex. I P 12 (Dutch decision dated February 19, 2009).) Promnefstroy did not seek access to any information from Yukos Finance in these proceedings. [4]

3   Promnefstroy was joined in this action by Rosneft, a creditor of Yukos Oil that maintained that it was entitled to Yukos Finance's shares and assets in satisfaction of its claim against Yukos Oil. (Application Ex. H P 2.33.)

4   The Dutch court noted, however, that Promnefstroy was seeking an "inquiry" in the Enterprise Chamber, another Dutch court, based on allegations of mismanagement against Godfrey and Misamore. (Application Ex. H P 3.2.) This action was rejected by the Enterprise Chamber. (Feldman Opp'n Ex. 3 P 3.16.)

b. February [*6] 19, 2009

On February 19, 2009, a Dutch court ordered Reid and Lynch, the directors whom Promnefstroy had attempted to appoint to the board of Yukos Finance, to disclose any actions they had taken on behalf of Yukos Finance and to "render their cooperation to undoing" those same actions. (Feldman Opp'n Ex. 4 PP 7.1-7.2 (Dutch decision dated February 19, 2009).) The court also enjoined Promnefstroy, Reid, and Lynch from exercising "any right[s] in relation to the Yukos Finance shares." (*Id.* PP 7.3-7.4.)

In the same proceeding, Promnefstroy sought "information about the state of affairs in regard to the sale of the interest in Transpetrol," as well as information about any attachments levied against shares of Yukos Finance by various creditors of the now defunct Yukos Oil. (*Id.*)The court concluded that "Promnefstroy *et al.* have no interest beyond the securing of the proceeds" from the sale of Transpetrol and thus "cannot lay claim to information about the state of affairs" of the transaction. (*Id.*)The court did, however, order Yukos Finance to disclose how *much* it received for the sale of the Lithuanian refinery (the proceeds of which were placed in the Fortis Account) and what attachments [*7] had been levied against Yukos Finance's stock by former creditors of Yukos Oil. (*Id.* PP 7.9, 7.10.)

c. February 25, 2009 Order

On February 25, 2009, the Dutch courts rebuffed an effort by Reid and Lynch [5] to force Yukos Finance, Godfrey, and Misamore to turn over "copies of the procedural documents, including records of hearings in the tax proceeding" that ultimately forced Yukos Oil into bankruptcy. (Feldman Opp'n Ex. 5 P 3.1 (Dutch decision dated February 25, 2009).)

5   Godfrey, Misamore, and Yukos Finance filed the action culminating in the February 25, 2009 decision against Reid and Lynch's similarly named Yukos Finance B.V., known in the Dutch Proceedings as "Yukos Finance (new)." Whatever the label, it is clear that Promnefstroy, Reid, Lynch, and "Yukos Finance (new)" are the same interested party for the purpose of the Dutch Proceedings.

d. May 1, 2009 Order and May 26, 2009 Appeal

On March 2, 2009, Promnefstroy commenced an additional proceeding against Godfrey, Misamore, Yukos International, Yukos Finance, and Yukos Oil, in which it asserted "that [Godfrey and Misamore] are indeed attempting to secretly remove the assets" of Yukos Finance and "are making use of various existing companies [*8] of the former Yukos Oil group spread out across the world, which are still under their control," to do so. (Application Ex. L P 38 (Promnefstroy Dutch court filing dated March 2, 2009).) Specifically, Promnefstroy asserted that Godfrey and Misamore were using another company under their control to secure collusive judgments against Yukos International. (Feldman Opp'n Ex. 7 P 3.1 (Dutch decision dated May 1, 2009).) These judgments were then enforced against the Fortis Account that was supposed to be frozen under the May 6, 2008 proceeding, thus circumventing the Dutch court's freezing order. (*Id.*)

In its request for relief, Promnefstroy sought an order forcing Misamore and Godfrey to return any funds they had removed from certain accounts. In addition, Promnefstroy requested that

> Yukos International, Godfrey and Misamore be ordered to give Promnefstroy copies of the bank statements at their disposition or under their control relating to the Fortis account and court documents, including documents regarding attachments, in respect of assets of and ongoing proceedings in the name of or against Yukos Finance, Yukos International and their subsidiaries, as Promnefstroy has a legitimate and [*9] urgent interest therein. [6]

(Application Ex. L P 39.) Promnefstroy was successful in

its request for information with the Dutch district court, which found that the alleged malfeasance of Misamore and Godfrey now entitled Promnefstroy to certain information regarding the balance and activity in the Fortis account, as well as any information regarding legal action or attachments initiated by or levied against Yukos Finance or Yukos International. (Feldman Opp'n Ex. 7 P 5.1.)

> 6  Promnefstroy requested further relief in these proceedings, including having the shares and affairs of Yukos Finance put under administration. (Feldman Opp'n Ex. 7 P 4.4.) These requests were rejected in the lower court. (*Id.*)

Promnefstroy's victory was short-lived, however, as the Dutch appellate court reversed the disclosure order and determined that

> [t]he implementation of the order given by the Court in Summary Proceedings will cause Promnefstroy to obtain free disposal of information with respect to Yukos Finance and Yukos International, which it can use in a manner and for purposes as it sees fit, without it having been established that it is entitled to the shares in Yukos Finance and accordingly is entitled [*10] to said information.

(Feldman Opp'n Ex. 8 P 5.2 (Dutch decision dated May 26, 2009).) The court further noted that "the provision of said information is irreversible in the sense that the knowledge thus acquired can no longer be undone." (*Id.* P 5.3.)

B. The § 1782 Application

Promnefstroy filed this application to take discovery pursuant to 28 U.S.C. § 1782 on June 4, 2009, approximately one week after its attempt to compel discovery was rejected by the Dutch appeals court.

The application targets Feldman, a resident of New York State who was intimately involved in the affairs of Yukos Oil, having served as Corporate Secretary of Yukos Oil in 2003 and then as Secretary of the Board of Directors in 2004. (Application 4.) Today, Feldman serves on the Board of Yukos Hydrocarbons, a company not related to Yukos Finance, but nevertheless, according

to Promnefstroy, an entity ultimately controlled by Misamore and Godfrey. (Application Ex. L P 29.)

The application for foreign discovery itself contains forty-one paragraphs of document requests in addition to a request for the deposition testimony from Feldman. The vast documentary requests do not focus on Feldman's personal or business affairs, [*11] but focus almost exclusively on the business practices, litigation, financial statements, bank accounts, calendars, and even personnel changes of Yukos Finance, its subsidiaries, and related companies, which are parties to the Dutch Proceedings.

The briefs in this matter were fully submitted on August 13, 2009. The Court held oral argument on August 25, 2009 sitting in the Miscellaneous Part of the Court ("Part I").

II. DISCUSSION

A. Legal Standard

[HN1]Section 1782 of Title 28 of the United States Code, entitled "Assistance to Foreign and International Tribunals and to Litigants before such Tribunals," provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). The statute authorizes district courts to grant such relief only where (1) the person from whom discovery is sought resides or is found in the district of the district court where the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by the foreign tribunal [*12] or "any interested person." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir. 2004) (citing *In re Application of Esses*, 101 F.3d 873, 875 (2d Cir. 1996)) (per curium)).

[HN2]For applications that meet the three statutory prerequisites, "Congress planned for district courts to exercise broad discretion over the issuance of discovery orders pursuant to § 1782(a)." *In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002); *see also Schmitz*, 376 F.3d at 83-84 (citing *In re Application of Metallgesellschaft AG*, 121 F.3d 77, 78 (2d Cir. 1997)). "This discretion, however, is not boundless" but must be exercised "'in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign

countries by example to provide similar means of assistance to our courts.'" *Schnitz,* 376 F.3d at 84 (quoting *Metallgesellschaft,* 121 F.3d at 79). Subsequently, the Supreme Court and lower courts have articulated several relevant considerations to further guide the discretion of district courts, including:

> (1) Whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and [*13] thus accessible absent § 1782 aid;

> (2) The nature of the foreign tribunal, the character of the proceedings underway abroad; and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;

> (3) Whether the § 1782 request conceals a[n] attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and

> (4) Whether the subpoena contains unduly intrusive or burdensome requests.

*In re Application of Microsoft Corp.,* 428 F. Supp. 2d 188, 192-93 (S.D.N.Y. 2006) (citing *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 264-65, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004)). [7]

> [7]  *Microsoft* divides the discretionary considerations into four factors. The *Intel* decision confined the same considerations to only two numbered factors. *Intel,* 542 U.S. at 264-65. Although the Court will analyze the current application under the four factors laid out in *Microsoft,* there would be no difference in the contents or the outcome of the analysis if the Court followed the *Intel* test.

B. Analysis

The parties do not dispute that the three mandatory requirements of § 1782 are met in this case. First, Feldman resides in the Southern District [*14] of New York. (Application 1.) Second, Promnefstroy seeks to use the information that would be obtained by this application in various proceedings currently pending in the Netherlands. (*Id.*) Finally, Promnefstroy is either a

plaintiff, defendant, or intervenor in many of those Dutch Proceedings. (*Id.* 5-9.) The Court therefore concludes that Promnefstroy has satisfied the technical requirements of § 1782 and will next consider whether the purposes of § 1782 are best served by approving Promnefstroy's application.

1. Foreign Tribunal's Jurisdictional Reach

The first discretionary factor asks the Court to evaluate whether the documents or testimony sought by the application are within the foreign tribunal's jurisdictional reach, and thus accessible absent resort to § 1782. *Microsoft,* 428 F. Supp. 2d at 192-93; *see also Intel* 542 U.S. at 264-65. In this case, the vast majority of the application covers documents within the reach of the Dutch courts. Therefore, the Court concludes that the first factor weighs in favor of Feldman.

As a preliminary matter, Promnefstroy asserts that the relevant inquiry is whether the *person* targeted by the subpoena is a party in the foreign proceedings, not whether [*15] the *information* is within the foreign tribunal's jurisdictional reach. In *Intel,* the Supreme Court explained factor one this way: [HN3]where the "foreign tribunal has jurisdiction over those appearing before it, [the foreign tribunal] can itself order them to produce evidence." *Intel,* 542 U.S. at 264. This rationale suggests that it is the foreign tribunal's ability to control the evidence and order production, not the nominal target of the § 1782 application, on which the district court should focus. Other courts in this district have agreed. *See In re Godfrey,* 526 F. Supp. 2d 417, 419 (S.D.N.Y. 2007) (asking "'whether the *document or testimony* sought were within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782 aid'" (quoting *Microsoft,* 428 F. Supp. 2d at 192) (emphasis added)); *Microsoft,* 428 F. Supp. 2d at 194 ("While IBM and Cleary Gottlieb are not 'participants,' *per se,* in the underlying proceeding, all the documents sought by Microsoft are within the Commission's reach."); *cf Schnitz,* 376 F.3d at 85 ("Although technically the respondent in the district was [the foreign counter-party's law firm], for all intents and purposes petitioners are seeking discovery [*16] from DT, their opponent in the German litigation."). *But see In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf* Misc. No. Civ. M19-88 (BJS), 2006 U.S. Dist. LEXIS 94161, 2006 WL 3844464, at *5 (S.D.N.Y. Dec. 29, 2006) ("When the target of discovery is not a party the foreign tribunal may be less inclined -- even if it is

empowered -- to compel third-party discovery or, more precisely here, to compel the production of material subject to a third-party's confidentiality restrictions.").

In this case, while Feldman may be beyond the reach of the Dutch courts, the information Promnefstroy seeks most certainly is not. For example, requests one through twelve and fourteen through eighteen relate to the assets, financial information, tax returns, sales or transfers of shares, asset or business appraisals, corporate records or books, communications between, and any calendars, planners, or journals of any "Misamore Entity," defined as any organization in the Yukos Finance corporate structure. (Subpoena, Document Requests PP 1-12, 14-18.) Only one or two of these initial requests even concern Feldman, and those do so only indirectly by relating to Yukos Hydrocarbons. (Id.)

Request thirteen seeks "any and all documents [*17] relating to Misamore and Godfrey's denial that Promnefstroy owns Yukos Finance," including contentions based on the illegitimacy of the Russian tax sale. (Id. P 13.) Similarly, request nineteen demands "any and all documents related to the subject matter or allegations of the legal action brought in the Amsterdam District Court by Misamore, Godfrey, and Yukos Finance . . . which action resulted in the judgment . . . dated October 31, 2007." (Id. P 19). Requests twenty and twenty-one demand any documents relating to the tax proceedings against Yukos Oil in Russia and its subsequent bankruptcy. (Id,PP 20-21.) Yet the Dutch decision dated February 25, 2009 denied Promnefstroy this exact relief-- access to information regarding the Russian bankruptcy and tax proceedings -- until and unless Promnefstroy won its appeal of the October 31, 2007 decision. (Feldman Opp'n Ex. 5 P 4.4.2.)

Requests twenty-two through twenty-four relate to the allegedly fraudulent lawsuit between Yukos Hydrocarbons and Yukos International. (Id. P 22-24.) Promnefstroy asserts that Feldman is an appropriate party from which, and this an appropriate jurisdiction in which, to discover documents relating to Yukos Hydrocarbon. [*18] Promnefstroy, however, also maintains that, through one of their holding companies, Godfrey and Misamore are ultimately "the executive officers of Yukos Hydrocarbons." (Application Ex. L P 29 (Promnefstroy filing in Dutch court dated March 19, 2009).) [8]

8   In its March 19, 2009 filing to the Dutch courts, Promnefstroy asserted that, while

Hydrocarbons was not owned by Yukos Finance:

> [I]t appears that all the shares in Yukos Hydrocarbons are held by the company Financial Performance Holdings B.V., domiciled in Amsterdam .... According to its registration in Amsterdam, managing director of Financial Performance Holdings B.V. is Godfrey. In addition, it appears from the registration also that all shares in this company are held by the foundation stichting Administratiekantoor Financial Performance Holdings, of which, according to the registration, managing directors are Godfrey and Misamore. Thus Godfrey and Misamore are the executive officers of Yukos Hydrocarbons.

(Application Ex. L P 29.)

When weighing the first discretionary factor, then, the Court must ask why Godfrey and/or Misamore, already parties to the Dutch Proceedings, are not the appropriate conduits for securing these documents. [*19] This is not to say that documents available in foreign proceedings cannot be procured by § 1782, but the first discretionary factor simply asks if the information is within the foreign tribunal's jurisdictional reach, and this material is.

The remaining requests seek information on legal claims or cases, transactions, and bank accounts relating to Yukos Finance, its subsidiaries, and certain third parties. (Id. PP 25-41.) None of these remaining document requests, however, relates to Feldman or any company purportedly owned by Feldman, controlled by Feldman, or employing Feldman.

Because the Court concludes that nearly all the documents that the subpoena seeks are also in the possession of parties to the foreign proceeding, the first factor weighs squarely in favor of Feldman.

2. Receptivity of the Foreign Government

The second discretionary factor requires district courts to inquire into the nature of foreign proceedings

and the "receptiveness" of the foreign tribunal to United States court assistance. *Microsoft*, 428 F. Supp. 2d at 194 (citing *Intel*, 542 U.S. at 264). Because the Court has not been presented with any evidence that the Dutch legal system rejects § 1782 type assistance, [*20] the second factor is neutral or slightly favors Promnefstroy.

United States courts have neither the competency nor the time to fully understand a foreign legal system or how such a system might respond to § 1782 assistance from a United States court. For this reason, district courts have been instructed to tread lightly and heed only clear statements by foreign tribunals. The Second Circuit counsels:

> We think that it is unwise -- as well as in tension with the aims of section 1782 -- for district judges to try to glean the accepted practices and attitudes of other nations from what are likely to be conflicting and, perhaps, biased interpretations of foreign law .... [W]e do not read the statute to condone speculative forays into legal territories unfamiliar to federal judges. Such a costly, time-consuming, and inherently unreliable method of deciding section 1782 requests cannot possibly promote the twin aims of the statute.

*Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099-1100 (2d Cir. 1995). Thus, courts must look for "authoritative proof that the foreign jurisdiction would reject the § 1782 assistance. *Id.* at 1100. Courts have found such proof in cases where the foreign tribunal [*21] or government has written to the district court hearing the application and expressly stated that it did not want the American court's help. *See Schmitz*, 376 F.3d at 84 (noting that the German Ministry of Justice and the local German prosecutor explicitly asked the district court judge to deny the discovery request); *In re Microsoft*, 428 F. Supp. 2d at 194 (noting explicit opposition to Microsoft's discovery request by the EU Commission).

In this case, Feldman asserts that "Promnefstroy has not demonstrated that Dutch courts would be amenable to a U.S. court providing Promnefstroy assistance in obtaining information." (Feldman Opp'n 15.) Feldman attempts to shift the burden to Promnefstroy to

affirmatively show that Dutch courts would be receptive to the § 1782 application now before this court. [HN4]District courts, however, are only to accept "authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of section 1782." *Euromepa*, 51 F.3d at 1100). (emphasis added). Feldman has not come forward with any such evidence. In such cases, "the Second Circuit has instructed that district courts generally should err on the side of permitting the requested discovery." [*22] *In re Gemeinshaftspraxis*, 2006 U.S. Dist. LEXIS 94161, 2006 WL 3844464, at *6 (citing *Euromepa*, 51 F.3d at 1101).

Alternatively, Feldman argues that the Dutch decisions provide ample evidence that the Dutch courts would not be receptive to United States judicial assistance. Feldman is undoubtedly correct that the foreign tribunal's rulings in the foreign proceeding are relevant to the Court's discretion under § 1782. Those rulings, however, are more relevant to whether the § 1782 request is an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country -- the third of the discretionary factors. [9] Because the Court cannot give Respondent double credit for the Dutch rulings, the second prong is neutral or in fact favors Promnefstroy.

> 9    The second *Intel* factor is "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance .... Specifically, a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 264-65. [*23] *Microsoft*, on the other hand, considers these inquiries as analytically distinct under factors two and three. While some overlap exists between the two inquiries, the Court finds the *Microsoft* formulation more suited to analyzing the facts of this application.

### 3.  Circumvention of Foreign Proof-Gathering Restrictions

The third discretionary factor seeks to identify "attemp[s] to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Microsoft*, 428 F. Supp. 2d at 192-93

(citing *Intel, 542 U.S. at 264-65*). Here, the record is replete with instances in which the Dutch courts rejected Promnefstroy's attempts to procure the same information it seeks through its § 1782 application. For this reason, the Court finds that the third factor weighs strongly in favor of Feldman.

[HN5]Under the third discretionary factor, district courts may consider how the applicant fared or is faring in the foreign jurisdiction in its attempts to procure the same information it now seeks under § 1782. *See Microsoft, 428 F. Supp. 2d at 195* (finding that Microsoft was trying to circumvent the Commission's rules that provided narrower discovery than Microsoft requested). [*24] In *Microsoft*, the Honorable Colleen McMahon, District Judge, explained the rationale and importance of the third discretionary factor: "Through its current application, Microsoft attempts to divest the Commission of jurisdiction over this matter and replace a European decision with one by this Court. However, a decision by this Court which would either preempt or contradict a decision by the Commission would render the Commission's proceedings meaningless." *Id. at 195.* Judge McMahon went on to explain that such interference is antithetical to the purpose of § 1782: "A decision by this Court upholding Microsoft's discovery request would contravene the purpose of § 1782 by pitting this Court against the Commission, rather than fostering cooperation between them." *Id.*

*Intel* indicates, however, that the foreign jurisdiction's discovery rules and rulings are not necessarily dispositive. *See Intel, 542 U.S. at 260.* Intel made clear that whether or not the foreign jurisdiction would allow discovery of the material, if it were located in that jurisdiction, is not dispositive. *See id.* [10] There is nothing in the *Intel* opinion, however, to suggest that discovery *must* be granted to parties who [*25] have repeatedly attempted to access the same types of information in a foreign tribunal only to have that foreign tribunal reject the *applicant's* requests.

> 10   In *Intel* the Court rejected the so-called "foreign discoverability rule," which asked whether, if the documents sought were actually located in the foreign jurisdiction, the applicant could obtain them in the foreign tribunal. *Intel, 542 U.S. at 260; see also In re Servicio Pan Americano de Proteccion, C.A., 354 F. Supp. 2d 269, 274-75 (S.D.N.Y. 2004).* In *Servicio Pan*

*Americano,* the Honorable Victor Marrero, District Judge, ordered discovery to proceed where a defendant in a foreign proceeding applied to take discovery against the plaintiff in those proceedings to overcome a "technical limitation" of Venezuelan discovery rules. *354 F. Supp. 2d at 274-75* ("The Court instead understands Pan Americano's application as a reasonable effort to overcome a technical limitation of Venezuelan discovery rules in order to obtain documents that are critical to its defense from *a corporation located within this District*." (emphasis added)). In this case, however, the documents that Promnefstroy primarily seeks relate to Dutch companies, in addition [*26] to Yukos Oil, a Russian company, and Yukos Hydrocarbons, a British Virgin Islands company. Further, Promnefstroy's subpoena sweeps broadly, seeking any and all documents that may touch a myriad of corporate entities. The applicant in *Servicio Pan Americano,* by contrast, requested a targeted subpoena seeking only documents relating to a single insurance policy. *Id. at 275.*

The Dutch proceedings reveal that Promnefstroy repeatedly sought information relating to the bank accounts, legal actions, and business decisions of Yukos Finance and its subsidiaries, but that it was routinely rebuffed by Dutch courts. For example, as noted above, the Dutch appeals court concluded that to allow Promnefstroy access to even the court documents and lists of attachment against Yukos Finance would "cause Promnefstroy to obtain free disposal of information with respect to Yukos Finance and Yukos International, which it can use in a manner and for purposes as it sees fit, without it having been established that it is entitled to the shares in Yukos Finance and accordingly is entitled to said information." (Feldman Opp'n Ex. 8 P 5.2.) Given the conclusions of the Dutch courts, granting Promnefstroy's Application [*27] would only frustrate the careful balance struck by the Dutch courts in the underlying Dutch Proceedings.

Another court in this district, faced with these very same underlying Dutch Proceedings, came to the same conclusion less than two years ago. Although the Honorable Jed S. Rakoff, District Judge, decided that the application in that case had failed to meet the mandatory requirements of § 1782, he went on to conclude that it still "would not be a case for exercising discretion to

provide the requested assistance, because the connection to the United States is slight at best and the likelihood of interfering with Dutch discovery policy is substantial." *In re Godfrey*, 526 F. Supp. 2d at 424. Although the target of the request now before the Court does reside within this District, the information that Promnefstroy seeks is principally of a foreign nature, even if Feldman also has access to it. Even more importantly, since Judge Rakoff's well reasoned opinion was issued, Promnefstroy has repeatedly made entreaties to various Dutch courts to get the same information it now seeks, and it has been rebuffed.

### 4. Burdensomeness

The final discretionary factor asks courts to be mindful of overly [*28] intrusive or burdensome discovery requests. *Microsoft*, 428 F. Supp. 2d at 192-93 (citing *Intel*, 542 U.S. at 264-65). Because Promnefstroy's application is unreasonable given the circumstances, the final factor weighs in favor of Feldman.

While few reported decisions address the issue of burdensomeness in the context of § 1782, the Court finds Promnefstroy's subpoena to be broad by any standard. Promnefstroy's application thus bears little resemblance to those cases in which such applications were routinely approved -- cases requesting a single document or report, or even those documents relating to a single transaction or event. *See, e.g., Gemeinshcaftspraxis*, 2006 U.S. Dist. LEXIS 94161, 2006 WL 3844464, at *8 (approving application seeking documents relating to the creation of a single report by consulting firm); *In re Servicio Pan Americano de Proteccion, C.A.*, 354 F. Supp. 2d 269, 275 (S.D.N.Y. 2004) (approving application for "documents related to . . . insurance coverage for a single loss on a single day"). Instead, Promnefstroy's application extends to a wide array of documents related to tens of business entities and to all of their affairs, many of which Feldman is not even associated with. (*See* [*29] *generally* Subpoena, Document Requests.) The subpoena also includes all of Feldman's computers since 2005. (*Id* P 14.)

\* \* \*

In sum, three of the four discretionary factors articulated in *Microsoft* counsel against granting Promnefstroy's application. While Feldman failed to overcome the assumption that the Netherlands would not object to United States assistance, this single factor is too

meager to outweigh the availability of the evidence to the Dutch courts, the serious attempt to circumvent well-reasoned Dutch court orders, and the tremendous breadth of the application.

Further, granting Promnefstroy's application would frustrate rather than promote the twin aims of § 1782: "'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'" *Schmitz*, 376 F.3d at 84 (quoting *In re Malev*, 964 F.2d 97, 100 (2d Cir. 1992)). Put simply, this Court would not provide "efficient means of assistance" to litigants by giving parties an incentive, after losing in their original requests for information in the foreign tribunal, to rush to the United States in [*30] hopes of obtaining a second bite at the apple. Finally, ordering the discovery would not "encourage foreign countries by example," unless that example is to aid litigants in circumventing the judicial systems of foreign countries. Therefore, the Court finds that granting Promnefstroy's applications would not promote the twin aims of § 1782. [11]

> [11]   Because the purposes of § 1782 are best served by denying Promnefstroy's application, the Court need not address Feldman's argument for judicial estoppel and request for reciprocal discovery.

### III. Conclusion

Promnefstroy no doubt has a good-faith belief that it is the lawful owner of Yukos Finance and that it will be vindicated in its Dutch appeal. The Court is not convinced, however, that Feldman is an appropriate target for § 1782 relief in this case. Promnefstroy seeks primarily corporate records of transactions, legal actions, and finances of entities controlled by Misamore and Godfrey — entities organized mainly in the Netherlands, but in no case in the United States. Indeed, Promnefstroy filed its § 1782 Application not because Feldman was the only party with these documents, but because Dutch courts had rejected similar requests for the [*31] information from more appropriate parties: Yukos Finance, Yukos Oil, Misamore, Godfrey, and Rebgun -- all of which are parties, or controlled by parties, to the Dutch Proceedings.

For the reasons stated above, Promnefstroy's application to take discovery pursuant to 28 U.S.C. §

2009 U.S. Dist. LEXIS 98610, *31

1782 is DENIED.

    The Clerk of the court is respectfully requested to terminate this matter.

    SO ORDERED.

    /s/ Richard J. Sullivan

RICHARD J. SULLIVAN

united States District Judge

Dated: October 15, 2009

New York, New York

LEXSEE



Caution
As of: Feb 21, 2011

IN RE: APPLICATION OF SARRIO S.A. FOR ASSISTANCE BEFORE
FOREIGN TRIBUNAL

Case No. M 9-372

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1995 U.S. Dist. LEXIS 14822

October 10, 1995, Decided
October 11, 1995, FILED

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Movants, an investment office and three Spanish corporations, filed a motion for a protective order limiting a discovery request by respondent, which was a Spanish corporation, from a non-party witness. Respondent had filed an action in Spain against movants for breach of contract and sought to hold the investment office liable by a "lifting of the corporate veil" theory, and had served the witness with subpoenas issued under 28 U.S.C.S. § 1782.

**OVERVIEW:** After filing the underlying Spanish action, respondent furnished house counsel for the witness, which was a domestic corporation, with a proposed subpoena to produce documents and witnesses located both within the United States and abroad. At counsel's request, certain documents were sent to him from the witness's branches in Spain and in England for review to determine if they were responsive to the proposed subpoena, which was never served. Later, respondent served the witness with subpoenas, issued under § 1782, to produce documents in its possession or control, including those in the possession or control of its counsel. Counsel stated that the only arguably responsive documents were those previously sent to him for review.

On movants' motion, the court found: (1) although the language of § 1782 did not indicate that discovery of documents was limited to evidence located in the United States, it was not intended to provide discovery of evidence maintained within a foreign jurisdiction; and (2) as the documents were sent to the witness's legal counsel for advice on compliance with the proposed subpoena, the witness properly invoked the attorney/client privilege.

**OUTCOME:** The court held that the documents did not have to be produced as required by the subpoenas.

**CORE TERMS:** subpoena, discovery, declaration, tribunal, production of documents, responsive, abroad, foreign country, seems clear, collectively, subsidiary, empower, advice, parte, person appointed, prescribe, custody

**LexisNexis(R) Headnotes**

*International Law > Dispute Resolution > Evidence > Assistance*
[HN1]See 28 U.S.C.S. § 1782, pt. 6(a).

Page 1

*Civil Procedure > Discovery > Methods > Foreign Discovery*
*International Law > Dispute Resolution > Evidence > Assistance*
[HN2]Despite its unrestrictive language, 28 U.S.C.S. § 1782 is not intended to provide the discovery of evidence maintained within a foreign jurisdiction.

*Civil Procedure > Counsel > General Overview*
[HN3]A lawyer shall be able to provide advice to his client with respect to the potential discoverability of documents without having to travel to where the documents are located.

*Legal Ethics > Client Relations > General Overview*
[HN4]Public policy favors open and frank communications between a lawyer and his or her client, and prompt review of a client's documents by a lawyer are a goal of federal discovery consonant with this policy.

*International Law > Dispute Resolution > Evidence > Assistance*
[HN5]The United States District Court for the Southern District of New York is unwilling to hold that 28 U.S.C.S. § 1782 requires the production of evidence located in Spain.

COUNSEL: [*1] Counsel for Movants: Baker & McKenzie, New York, NY, By: David Zaslowsky, Esq.

Counsel for Respondent: Hughes Hubbard & Reed, Washington, D.C., By: William R. Stein, Esq.

JUDGES: ROBERT P. PATTERSON, JR., U.S.D.J.

OPINION BY: ROBERT P. PATTERSON, JR.

OPINION

OPINION AND ORDER

ROBERT P. PATTERSON, U.S. DISTRICT JUDGE

Attorneys for the Kuwait Investment Authority on behalf of itself and its London Branch, the Kuwait Investment Office ("KIA") and three Spanish corporations, Grupa Torras S.A., Torraspapel S.A., Torras Hostench London Ltd. and Sarriopapel y Celulosa, S.A., (collectively, "the Movants") move for a protective order limiting discovery sought by another Spanish corporation, Sarrio S.A. ("Sarrio"), from Chase Manhattan Corporation and Chase Manhattan Bank, N.A. (collectively, "Chase") pursuant to subpoenas (the "Subpoenas") issued to Chase under the authority of an ex parte order issued pursuant to 28 U.S.C. § 1782 in Part I of the Court on May 23, 1995, or, in the alternative, for an order vacating the May 23, 1995 order and quashing the Subpoenas or for other appropriate relief. The Movants maintain that 28 U.S.C. § 1782 does not empower this Court to require production [*2] of evidence which is located beyond the borders of the United States.

In the underlying litigation brought in Spain in 1993, Sarrio charges the three Spanish corporations with breach of contract and seeks to hold KIA liable by a "lifting of the corporate veil" theory. (Pelayo Jimenez Declaration, April 26, 1994 (the "Jimenez Decl.") at P 4(1).)

During February 1994, Sarrio contacted William A. Cherno, Esq., house counsel for Chase, and furnished him with a proposed subpoena, together with a proposed affidavit, which Sarrio apparently intended to submit to this Court for authorization to issue subpoenas pursuant to 28 U.S.C. § 1782. [1] The proposed subpoena called for the production of documents and witnesses located both within the United States and abroad. Counsel for Chase noticed that the proposed subpoena called for documents related to a transaction carried out by Chase's European branches. In order to determine whether these documents would be responsive to the proposed subpoenas, Counsel requested that the potentially responsive documents be sent from the European Branches to him for review. (Cherno Declaration, July 27, 1995 ("Cherno Decl.") at P 3.) The proposed subpoena [*3] was never served.

> 1 In February 1994 Sarrio had obtained an ex parte order from Part I of this Court to issue three subpoenas for discovery from third party Bank America Corporation and certain of its subsidiaries. The Movants moved to modify or quash those subpoenas on the grounds that the subpoenas called for the production of documentation located in Bank America Corporation's subsidiary offices located in Spain. Sarrio did not oppose the motion to quash and in October 1994 agreed to withdraw with prejudice its request for discovery of documents or witnesses located abroad. (Newman Affidavit,

July 27, 1995 ("Newman Aff.") at P 8.) The Declaration of Hans Smit, similar to that submitted on this motion to the effect that 28 U.S.C. § 1782, was not intended to provide discovery evidence located outside the United States, may have influenced Sarrio. (Smit Declaration, April 26, 1994 ("Smit Decl.").)

In May 1995, however, counsel for Sarrio served Chase with the Subpoenas the validity of which is the issue in [*4] this case. Each of the Subpoenas is limited to "documents in the possession, custody or control of Chase, including documents in the possession, custody or control of counsel for Chase, to the extent such documents are now or have been located within the United States at any time on or after May 1, 1995." (Cherno Decl. at Ex. 2.)

Mr. Cherno states that the only arguably responsive documents are those sent to him in 1994 from European branches of Chase which were collected solely to determine whether they might be responsive to the proposed subpoena received in 1994. (Cherno Decl. at P 7.)

After service by Sarrio of the Subpoenas on Chase, attorneys for the defendants in the Spanish action, brought a motion on July 17, 1995, charging that Sarrio was "in fraud of law" for infringing on Spanish mandatory law and constitutional rights because of its invocation of Section 1782 in the United States in order to obtain evidence located in Spain. [2] Subsequent to argument of the motion currently before this Court, the Spanish court determined it will not accept the defendants' motion of July 17, 1995. Thus, this Court is not presented with an authoritative declaration by a Spanish judicial [*5] body objecting to foreign discovery assistance in the event that 28 U.S.C. § 1782 permits discovery of evidence located abroad. Cf. In the Matter of the Application of Euromepa S.A., 51 F.3d 1095 (2d Cir. 1995). [3]

[2]   Pursuant to 28 U.S.C. § 1782 Sarrio has obtained discovery of documents located in Spain for use in the Spanish litigation by order of the United States District Court for the Western District of Texas. (Newman Aff. at Ex. 11(c), p.3.)
[3]   Euromepa allowed discovery of evidence located in the United States from a party engaged in a litigation in France.

That Section 1782 of Title 28 empowers this Court to require the production of documents from the foreign files of a witness is not easily decided). Section 1782 of Title 28 United States Code is entitled "Assistance to foreign and international tribunals and to litigants before such tribunals."

It [HN1]provides in pertinent part: 6

(a) The district court of the district in which a person resides or is found may order him to give [*6] his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules or Civil Procedure.

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

The language of Section 1782 [*7] does not indicate that discovery of documents is limited to evidence located in the United States. The legislative history, however, reflects that the primary intent of the 1964 amendments to Section 1782 was "to clarify and

liberalize existing U.S. procedures for assisting foreign and international tribunals and litigants in obtaining oral and documentary *evidence in the United States*." S. Rep. No. 1580, 88th Congress, 2nd Sess. (1964) *emphasis added; cf. Application of Silvia Gianoli Aldunate, 3 F.3d 54 (2d Cir. 1993).*

Professor Hans Smit, reporter of the International Rules of Judicial Procedure and the preparer of the final version of Section 1782, as amended in 1964, affirms that the purpose of the statute is only to provide evidence from witnesses and documents located in the United States. (Smit Decl. at P 14.) Professor Smit points out that if Section 1782 could be used to obtain discovery evidence located in a foreign country it would become an instrument for interfering with the regular court procedures of the foreign country and additionally, that there would be a heavy influx of discovery applications under Section 1782, especially in this jurisdiction where so [*8] many financial and multi-national institutions are centered.

Based on the Senate Report and the Smit Declaration, it seems clear that, [HN2]despite its unrestrictive language, Section 1782 was not intended to provide discovery of evidence maintained within a foreign jurisdiction. (Smit Decl. at. PP 13-15.)

Furthermore, in the underlying Spanish litigation, Sarrio apparently agreed that Section 1782 does not have an extraterritorial effect. Sarrio obtained a subpoena directed to Bank America which sought to use Section 1782 to obtain documents located in Spain. Faced with a motion to quash that subpoena, Sarrio agreed to restrict its scope to documents located in the United States. It is noteworthy that the subpoenas which Sarrio served on Chase require only discovery of documents located in the United States.

Once Professor Smit's restrictive interpretation of Section 1782 is adopted, the Court is faced with Subpoenas calling for production of documents sent from the Chase branches in Spain and England to the United States at the request of Mr. Cherno, counsel for Chase. The documents were sent by Chase to Mr. Cherno, its legal counsel, so he could provide legal advice with respect to [*9] its compliance with the proposed subpoena. [4] Accordingly, the attorney/client privilege has been properly invoked by Chase by its objections of a non-party witness. (Movants' Reply Mememorandum ("Reply Mem.") at Ex. C, P C.)

> 4   If the proposed subpoenas had contained the language concerning documents located in the United States which was included in the Subpoenas, it seems clear that Mr. Cherno would not have asked the Chase branches abroad to send the documents to him.

[HN3]A lawyer should be able to provide advice to his client with respect to the potential discoverability of documents without having to travel to where the documents are located in [HN4]Public policy favors open and frank communications between a lawyer and his or her client and prompt review of a client's documents by a lawyer are a goal of federal discovery consonant with this policy. The situation in question is similar to that of a non-resident defendant who presents himself in a jurisdiction solely to participate in court proceedings. He is immune [*10] from service of process, *Lamb v. Schmitt, 285 U.S. 222, 76 L. Ed. 720, 52 S. Ct. 317 (1932); Viking Penguin v. Janklow, 98 F.R.D. 763, 765 (S.D.N.Y. 1983).*

[HN5]The Court is unwilling to hold that Section 1782 requires production of evidence located in Spain. Sarrio is free to obtain production of documents located in Spain by court procedures in Spain. Therefore, the documents held by Chase's counsel which were sent to the United States only for review by counsel need not be produced as required by the Subpoenas.

IT IS SO ORDERED.

Dated: New York, New York

October 10, 1995

ROBERT P. PATTERSON, JR.

U.S.D.J.